**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| DESKTOP METAL, INC., | ) | |
| | ) | |
| Plaintiff and | ) | |
| Counterclaim-Defendant, | ) | |
| | ) | |
| v. | ) | Consolidated |
| | ) | C.A. No. 2024-1303-KSJM |
| NANO DIMENSION LTD. and NANO | ) | |
| US I, INC., | ) | |
| | ) | |
| Defendants and | ) | |
| Counterclaim-Plaintiffs. | ) | |

**POST-TRIAL MEMORANDUM OPINION**

Date Submitted: March 19, 2025
Date Decided: March 24, 2025

Michael A. Barlow, Veronica B. Bartholomew, QUINN EMANUEL URQUHART & SULLIVAN, LLP, Wilmington, Delaware; Michael B. Carlinsky, Andrew J. Rossman, Christopher D. Kercher, Jesse A. Bernstein, Peter H. Fountain, Kaitlin P. Sheehan, Heather K. Christenson, Jonathan E. Feder, Jianjian Ye, QUINN EMANUEL URQUHART & SULLIVAN, LLP, New York, New York; William A. Burck, QUINN EMANUEL URQUHART & SULLIVAN, LLP, Washington, D.C.; *Counsel for Plaintiff and Counterclaim Defendant Desktop Metal, Inc.*

A. Thompson Bayliss, E. Wade Houston, Florentina D. Field, Caleb R. Volz, ABRAMS & BAYLISS LLP, Wilmington, Delaware; Michael C. Holmes, Jeffrey Crough, Andrew E. Jackson, VINSON & ELKINS LLP, Dallas, Texas; Jason M. Halper, Sara E. Brauerman, New York, New York; Lewis R. Clayton, Jeffrey J. Recher, Ariane Rockoff-Kirk, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, New York, New York; *Counsel for Defendants and Counterclaim Plaintiffs Nano Dimension LTD. and Nano US I, Inc.*

**McCORMICK, C.**

This is a broken-deal suit to enforce a July 2, 2024 merger agreement by which Nano Dimension, Ltd. and its affiliate agreed to acquire Desktop Metal, Inc. Nano is looking to get out of the merger. Desktop seeks to force Nano to close. Chalking up yet another victory for deal certainty, this post-trial decision awards Desktop specific performance.

The merger agreement conditions closing on regulatory approval, including approval by the Committee on Foreign Investment in the United States ("CFIUS"). Desktop makes industrial-use 3D printers that create specialized parts for missile defense and nuclear capabilities. The parties thus anticipated that CFIUS approval would be complicated and would likely require that Nano enter into a national security agreement, or "NSA." Desktop, therefore, negotiated for a "hell or high water" provision requiring that Nano take all actions necessary to obtain CFIUS approval. Desktop was also worried about delay resulting from CFIUS approval. The parties had agreed to an end date of January 31, 2025, to be extended for regulatory approval only. But Desktop was concerned about having enough cash to get to closing, and so Desktop secured Nano's agreement to use reasonable best efforts to close as soon as reasonably possible. Coupled with the hell-or-high-water provision, the contractual scheme seemed designed to ensure deal certainty and speed.

Initially, the parties worked cooperatively toward CFIUS approval and on integration efforts generally. The companies expected to close in the fourth quarter of 2024 and, come November, were basically on track to get there. Then, Nano experienced a change in leadership and a change of heart.

Nano's second-largest stockholder, Murchinson Ltd., had opposed the Desktop deal from the outset. Murchinson board observers spoke out against the deal at the Nano board meeting convened to consider the Desktop merger agreement, arguing that Nano should wait for Desktop to become insolvent and then buy the company in bankruptcy proceedings. But Nano had been trying to buy Desktop since 2022. Nano had even gone so far as to scuttle non-party Stratasys's prior agreement to acquire Desktop by convincing the Stratasys stockholders to vote down the deal. Nano's strategy worked. Once the Stratasys deal failed, Desktop agreed to sell to Nano at a steep discount to the Stratasys deal price.

After the Nano board approved the Desktop merger agreement over Murchinson's objection, Murchinson launched a proxy contest in protest. Murchinson nominated a slate of directors and vowed to unwind the Desktop deal they were elected. By December 6, Murchinson had gained control of four of ten Nano board seats. By December 16, pressure from the four Murchinson board members led the six legacy directors to resign. By the end of December, the Murchinson-controlled board had removed or sidelined key Nano executives and members of the integration team.

Meanwhile, CFIUS approval was then (as it is now) the sole condition to closing. Nano had received a draft NSA from CFIUS in November and sent comments back on December 4, two days before Murchinson won the stockholder election. CFIUS replied on December 10, when Nano was mid-way through its regime change. Nano sat silent, which Desktop interpreted as an early indicator that the Murchinson

2

board intended to make good on its campaign promise to tank the merger. And Desktop was right, as internal communications revealed that Murchinson had zeroed in on CFIUS approval as a means to defeat the deal even prior to gaining control of the Nano board. Desktop filed this suit on December 16 to enforce the hell-or-high-water provision.

Nano developed a new strategy in response to the suit—delay. Every day that passed worsened Desktop's cash position, imperiling Desktop's "no-bankruptcy" covenant in the merger agreement, and making Murchinson's goal of buying Desktop out of bankruptcy more realistic. Under the Murchinson board's direction, Nano fought Desktop's motion to expedite proceedings, delayed responding to CFIUS's December 10 draft NSA by 38 days, dribbled out objections to the draft NSAs as the litigation unfolded, and even moved to relax the expedited schedule. During that time, Nano also added counterclaims, contending that Desktop failed the ordinary-course covenants and no-bankruptcy condition of the merger agreement, thus giving Nano a basis to terminate.

The court ordered expedition over Nano's opposition, and herculean discovery efforts toward a two-day trial ensued. The parties presented evidence on Desktop's claims and Nano's counterclaims. In the end, Desktop prevailed, proving that Nano breached its obligations to take all actions necessary to obtain CFIUS approval and use reasonable best efforts to close as soon as reasonably possible. Nano, meanwhile, failed to prove a failure of any covenant or condition. There was one close call—the no-bankruptcy covenant—but Nano did not meet its burden of proof. If Nano had

3

met its burden, Desktop proved that Nano materially contributed to that failure by breaching its reasonable best efforts obligations.

Desktop is entitled to specific performance. Nano must enter the NSA. Because that is the only condition to close, Nano must also close the merger.

## I. FACTUAL BACKGROUND

Trial took place over two days. The record comprises 2,620 trial exhibits, live testimony from seven fact and four expert witnesses, deposition testimony from eleven fact and nine expert witnesses, and 47 stipulations of fact. These are the facts as the court finds them after trial.[1]

---

[1] This decision cites to: C.A. No. 2024-1303-KSJM docket entries (by docket "Dkt." number); trial exhibits (by "JX" number); the trial transcript, Dkts. 288–289 ("Trial Tr."); and stipulated facts set forth in the Parties' Stipulation and Pre-Trial Order, Dkt. 257 ("PTO"). The fact witnesses were: Ofir Baharav (Nano Chairman); Dale Baker (Former Nano Chief Revenue Officer, offered by deposition); Joyous Chiu-Rothell (Desktop Vice President, Global Revenue and Operations, offered by deposition); Jason Cole (Desktop CFO); Ric Fulop (Desktop CEO); Michael Jordan (Desktop Vice President, Finance and Treasury, offered by deposition); Julien Lederman (Interim Nano CEO); Zivi Nedivi (Nano President); Tom Nogueira (Desktop COO); Tomer Pinchas (Nano CFO); Yoav Stern (Former Nano CEO, offered by deposition). The expert witnesses were: Yvette Austin (Desktop Rebuttal Financial Expert); Jon Foster (Desktop Commercial Lending Expert, offered by deposition); Assaf Hamdani (Nano Israeli Law Expert, offered by deposition); Kobi Kastiel (Desktop Israeli Law Expert, offered by deposition); Brian Kelley (Nano Commercial Lending Expert, offered by deposition); Jeffrey Kopa (Nano Financial Expert); Britt Mosman (Desktop CFIUS Expert); Steve Solomon (Nano M&A Expert, offered by deposition); Christopher Wall (Nano CFIUS Expert). The transcripts of the witnesses' respective depositions are cited using the witnesses' last names and "Dep. Tr."

4

## A. Desktop Struggles To Achieve Profitability And Considers A Sale.

Ric Fulop founded Desktop in 2015 to "bring powder metallurgy to the 3D printing industry."[2] Desktop went public in December 2020. Its stock trades on the NYSE.[3]

Desktop embarked on an aggressive acquisition strategy in the years immediately prior to and following its IPO (completing 14 acquisitions between 2019 and 2021).[4] And Desktop grew to be a major player in the industry—it now provides industrial-use 3D printers that create specialized parts for space travel, commercial flight, missile defense, and nuclear capabilities.[5] But Desktop struggled to achieve profitability.[6]

In June 2022, Desktop began an initiative aimed at integrating its recent acquisitions and minimizing costs.[7] In October 2022, Desktop hired Jason Cole as

---

[2] Trial Tr. at 499:7–16 (Fulop).

[3] JX-55 (Desktop Metal 2020 10-K) at 149.

[4] *Id.* at 81–82; JX-76 at 98–114.

[5] Trial Tr. at 500:5–13, 502:14–20 (Fulop).

[6] *Id.* at 364:12–20 (Cole); Kelley Dep. Tr. at 82:19–83:1.

[7] JX-372 (Desktop Metal 2023 10-K) at 50 ("On June 10, 2022, the Board of Directors approved a strategic integration and cost optimization initiative that included a global workforce reduction, facilities consolidation, and other operational savings measures (the '2022 Initiative'). The purpose of the 2022 Initiative was to streamline our operational structure, reduce our operating expenses and manage our cash flows.").

CFO to implement aggressive cost-cutting initiatives and other measures aimed at improving Desktop's bottom line.[8]

When Cole joined Desktop, the company was burning cash at an unsustainable rate—over $50 million per quarter.[9] To address Desktop's spending, Cole determined that "everything relating to cash management was a high priority."[10] The category of "cash management" included Desktop's treatment of its accounts payables and accounts receivable.[11] Before 2023, Desktop had been paying its invoices without "a lot of critical thinking based on whether or not it should be paid" or negotiating payment terms.[12] Further, Desktop's period of heavy acquisitions left the company with a bevy of new receivables that "weren't really tackled," and thus "started to age and bloat."[13]

Under Cole's leadership, Desktop made changes to its purchase order and collections processes, looking for "opportunit[ies] to extend [Desktop's] payables" and asking its collections group to "fan out and escalate when they couldn't get

---

[8] Trial Tr. at 363:10–19, 364:9–365:20 (Cole); *id.* at 500:14–22 (Fulop); JX-92 at 2 (Desktop Metal press release regarding hiring Cole, noting that he has "a lot of experience in M&A integration and improving costs and efficiencies.").

[9] Trial Tr. at 364:12–20 (Cole).

[10] *Id.* at 365:13–20 (Cole).

[11] *Id.*

[12] *Id.* at 366:3–13 (Cole).

[13] *Id.* at 367:22–368:2 (Cole).

6

collections."[14]  Desktop also consolidated locations in the United States and Canada and reduced its workforce by 15%."[15]

Desktop's efforts paid off.  The company's first quarter 2023 adjusted EBITDA[16] was negative $24.4 million; by the end of the first quarter of 2024, the company had reduced that deficit to $13.6 million.[17]

By late 2022, Desktop had also begun considering a sale of the company.  As Fulop testified, the 3D printing industry was entering a phase of consolidation:  "Only one of the companies that's public is really profitable.  And like all industries where they reach that phase, I felt like we had to be part of that consolidation effort to make the business profitable."[18]

[14] *Id.* at 366:16–368:14 (Cole).

[15] JX-372 at 50.

[16] Desktop defines "adjusted EBITDA" as "EBITDA adjusted for change in fair value of investments, inventory step-up adjustment, stock-based compensation expense, restructuring expense, goodwill impairment and acquisition-related and integration costs."  JX-471 at 36.

[17] JX-471 (Desktop Metal Q1 2024 10-Q) at 37; *see also* JX-461 (March 21, 2024 analyst report stating that Desktop's "cost reductions have started to work through the model with operating expenses declining sequentially every quarter since Q1'22").

[18] Trial Tr. at 500:16–22 (Fulop).

## B. Nano Pursues A Deal With Desktop And Thwarts Desktop's Merger With Stratasys.

Nano is a NASDAQ-listed Israeli company that designs and manufactures additive electronics, additive manufacturing 3D printing machines, and consumable materials.[19] Nano is smaller than Desktop but has significant liquid assets.[20]

Starting in 2021, Nano engaged in a strategy to consolidate the additive manufacturing industry, taking advantage of a downward shift in valuations of its competitors and adjacent technologies.[21]

Nano approached Desktop about a possible acquisition in 2022.[22] On November 17, 2022, the parties entered into a mutual Confidential Disclosure Agreement that included a standstill provision.[23] Nano subsequently made several offers to acquire Desktop, and Desktop made a counteroffer to Nano on February 3, 2023.[24] No one accepted. Negotiations reached an impasse.[25]

Desktop then resumed early-stage merger negotiations with another 3D printing company, Stratasys Ltd. In May 2023, Stratasys agreed to buy Desktop for

---

[19] PTO ¶¶ 21, 22. 3D printing is one form of "additive manufacturing," the process of creating objects layer-by-layer from a digital file. By contrast, "subtractive" creates objects by removing material from a solid block.

[20] *See, e.g.*, JX-1225 at 10.

[21] *See* JX-612 at 19; JX-464 at 12.

[22] Trial Tr. at 9:17–21 (Nogueira); *id.* at 363:15–364:8 (Cole).

[23] PTO ¶ 27.

[24] *Id.*

[25] *Id.*

more than $600 million.[26] The transaction was subject to stockholder approval by both companies.[27]

Nano was Stratasys's largest stockholder.[28] Immediately following the announcement of the Desktop-Stratasys merger, Nano launched an unsolicited partial tender offer to acquire additional Stratasys stock.[29] By the time of the Stratasys stockholder vote, Nano held approximately 14.1% of Stratasys's ordinary shares at the time. Nano publicly declared its intention to vote against the Desktop-Stratasys and encouraged other stockholders to "join in casting votes against the transaction."[30] The Stratasys stockholders voted down the merger on September 28, 2023.[31]

The next day, Nano contacted Desktop to resume merger discussions.[32] Nano began diligence, which extended through the first half of 2024.[33] Nano's diligence efforts revealed Desktop's deteriorating financial condition, including that the company (i) was suffering from a high cash burn rate,[34] (ii) maintained accounts

---

[26] Trial Tr. at 7:13–22 (Nogueira).

[27] *Id.* at 8:5–13 (Nogueira).

[28] *Id.* at 8:14–9:2 (Nogueira).

[29] JX-178 at 1.

[30] JX-335 at 4.

[31] PTO ¶ 30.

[32] *Id.* ¶¶ 30–31; Trial Tr. at 9:9–16 (Nogueira).

[33] Trial Tr. at 9:22–10:10 (Nogueira).

[34] Pinchas Dep. Tr. at 92:25–93:16; *see also* Stern Dep. Tr. at 123:6–124:13 (noting that Nano's financial diligence advisor was projecting Desktop's cash burn to be "materially higher" than what Desktop itself was projecting).

9

receivable with "high balance, with some customers with very long payment terms, and problematic inventory status[es],"[35] and (iii) had issues with "slow moving" inventory.[36]

After additional rounds of negotiations, on May 15, 2024, Nano presented its final offer to acquire Desktop for total consideration of approximately $183 million— a significant discount to the Stratasys deal price.[37] The parties agreed on final terms of an agreement (the "Merger Agreement")[38], and the companies' respective boards scheduled July 2 meetings to approve the Merger Agreement.[39]

### C. Murchinson Opposes Nano's Merger With Desktop.

As Desktop and Nano negotiated the Merger Agreement, Nano faced opposition to the deal by its second-largest stockholder, Murchinson, a Canadian hedge fund founded by Marc Bistricer.[40] In January 2022, Murchinson acquired a minority stake in Nano and commenced a campaign to replace Nano's directors and

---

[35] Pinchas Dep. Tr. at 94:6–16; *see also* Stern Dep. Tr. at 125:24–126:12 (agreeing that diligence revealed that Desktop had "considerably overdue AR," which might indicate "revenue recognition issues at Desktop Metal").

[36] Pinchas Dep. Tr. at 94:23–95:10; Stern Dep. Tr. at 125:1–9 (agreeing that diligence revealed "a risk of material inventory write down post deal").

[37] JX-544; JX-712.

[38] JX-689 ("Merger Agr.").

[39] JX-665; JX-694.

[40] *See, e.g.*, JX-3316 at 2; JX-106 at 4.

overhaul corporate governance.[41] Murchinson's goal is to narrow the gap between Nano's stock price and cash on hand, including by opposing Nano's M&A strategy.[42]

On January 23, 2023, Murchinson filed a Schedule 13D disclosing a 5.1% stake in Nano and demanding a special general meeting of stockholders.[43] Murchinson targeted Nano's "ill-advised acquisition strategy," and called for the removal of CEO Yoav Stern and Nano directors, to be replaced by Murchinson board nominees Kenneth Traub and Joshua Rosensweig.[44]

Nano's board rejected Murchinson's demand to call a special meeting, issued around 52 million new shares, and adopted a poison pill.[45] In response, Murchinson filed suit in an Israeli court seeking a temporary restraining order ("TRO") and declaratory judgment that its demanded meeting was valid.[46] On April 16, the Israeli court granted the TRO in part, appointing Traub and Rosensweig to serve as non-voting board observers during the Israeli litigation.[47]

In March 2024, Murchinson began a campaign to prevent a Desktop-Nano deal. On March 11, 2024, Murchinson's Moshe Sarfaty emailed Fulop directly to express

---

[41] JX-3315 at 12.

[42] *See, e.g.*, JX-439; JX-3370 at 2; JX-933 at 1; *see also* Trial Tr. at 123:8–24 (Lederman).

[43] *See* JX-106 at 4; JX-114 at 24.

[44] JX-123 at 20.

[45] JX-108 at 8, 30; JX-109 at 4–5; JX-114 at 24–25.

[46] JX-3337.

[47] *Id.* at 28.

his strong opposition to Nano's acquisition of Desktop.[48]  The penultimate paragraph of Sarfaty's multi-page message stated:

> Given our sizeable investment in Nano and our ongoing attempt to seek independent board representation, please be advised that we do not intend to sit idly by and watch Stern waste shareholders' money on dubious and ill-motivated acquisitions.  We have every intention to challenge any such improper deal.[49]

Nano recognized the threat Murchinson posed to its acquisition strategy and sued Murchinson in Israeli court seeking a TRO.[50]  Nano's CFO, Tomer Pinchas, submitted a sworn affidavit in the Israeli litigation stating that, if Murchinson gained control, Nano would unwind a potential Desktop deal.[51]

Murchinson's opposition to the Desktop acquisition intensified as the deal approached finalization.  On June 28, Murchinson sent an open letter to Nano stockholders declaring that "if the Company were to acquire [Desktop] . . . Nano would be . . . effectively making this would-be deal value dilutive by definition" and that it "intend[s] to object to any deal that is not in Nano's and its shareholders' best interests."[52]  Murchinson's letter also announced support for a new board that will "consider all options for unwinding any such deal."[53]

---

[48] JX-439 at 3.

[49] *Id.*

[50] JX-147 at 2; JX-3310.

[51] JX-3310 at 5; Trial Tr. at 483:3–12 (Pinchas).

[52] JX-3317 at 2 (emphasis omitted).

[53] *Id.*; Trial Tr. at 282:5–15 (Baharav).

During the July 2 meeting, Murchinson tried to persuade Nano's board to vote down the transaction. At the time, the Nano board comprised Dr. Yoav Nissan-Cohen, Chris Moran, General Michael Garrett, Oded Gera, Eitan Ben-Eliahu, Roni Kleinfeld, and Georgette Mosbacher.[54] Traub and Rosensweig attended as observers.[55]

In advance of the meeting, Sarfaty messaged Traub talking points in case "the idea of buying Desktop . . . comes up in a discussion[.]"[56] The points included the idea that Desktop "seems to be on the ropes" and that Nano should "let it run out of cash completely and buy the parts of it that are useful to Nano[.]"[57] Traub made this point at Nano's board meeting that day, stating that it might be more prudent to wait for Desktop to file for bankruptcy and then buy assets out of the bankruptcy proceedings.[58] Traub was rebuffed by Nano's then-CEO, Stern.[59] Nano's directors approved the Merger Agreement unanimously on July 2 over Murchinston's objections.[60]

---

[54] JX-927.

[55] *Id.*

[56] JX-3370 at 2.

[57] *Id.* at 3.

[58] Stern Dep. Tr. at 33:25–34:8, 133:14–134:10; JX-927 at 3.

[59] JX-927 at 3.

[60] *Id.* at 6.

**D. The Companies Execute The Merger Agreement.**

Desktop's board also approved the Merger Agreement on July 2.[61] The companies jointly announced the deal the next day.[62]

Under the Merger Agreement, Nano is required to acquire all outstanding shares of Desktop in an all-cash transaction for approximately $183 million or $5.50 per share, with closing price adjusted downward by a maximum of $1.43 (to $4.07 per share) based on three items: outstanding severance plans ($0.0325), bridge loan withdrawals ($0.80), and unpaid transaction expenses ($0.60) (the "Merger").[63] The Merger consideration of $183 million represented a 27.4% premium to Desktop stock's trading price.

Desktop had two primary goals in negotiating the Merger Agreement: speed and certainty.[64] As to speed, Desktop negotiated for an obligation that Nano would use its "reasonable best efforts" to close "as soon as reasonably possible."[65] The parties agreed on an outside date of January 31, 2025, which could be extended only to allow for regulatory approval.[66] As to certainty, the parties anticipated a complicated regulatory approval process. The parties therefore carefully negotiated the provision of the Merger Agreement concerning regulatory approval.

---

[61] JX-700; JX-927.

[62] JX-712; JX-711; JX-716.

[63] Merger Agr. at 53, 56, 60.

[64] Trial Tr. at 11:3–9 (Nogueira).

[65] Merger Agr. § 6.7(a).

[66] *Id.* § 8.1(b)(i).

14

### 1. CFIUS-Approval Provisions

Desktop bargained for commitments related to regulatory approval in Section 6.7(b) of the Merger Agreement.

The parties agreed that "each of the parties shall use its reasonable best efforts to resolve any objection that may be asserted by any Governmental Entity with respect to the Merger[.]"[67]

In addition to the reasonable-best-efforts provision applicable to all regulatory approvals, Desktop secured a heightened commitment from Nano concerning approval from CFIUS,[68] an interagency committee that reviews mergers that may result in foreign control of U.S. businesses and considers the foreign company's potential to impact national security.[69]

At trial, the parties introduced expert testimony to explain the CFIUS process. Desktop called Britt Mosman, Co-Chair of the Global Trade and Investment Group at the law firm of Willkie Farr & Gallagher LLP.[70] Nano called Christopher Wall, senior international trade partner of Pillsbury Winthrop Shaw Pittman LLP, who served on CFIUS while Assistant Secretary of Commerce.[71] Each were credible and helpful.

---

[67] *Id.* § 6.7(b).

[68] *Id.* § 6.7(a); Trial Tr. at 12:16–13:7 (Nogueira); JX-509 at 12–13.

[69] 50 U.S.C. § 4565; JX-1974 at 8–9; JX-1945 at 5.

[70] Trial Tr. at 638:4–656:22 (Mosman); JX-1950 (Mosman Rep't) at 4.

[71] Trial Tr. at 583:1–616:22 (Wall); JX-1974 (Wall Rep't) at 6.

15

According to the experts, the Merger is a "covered control transaction" requiring CFIUS approval under 31 C.F.R. § 200.[72] To obtain approval, parties to a covered control transaction must file a Joint Voluntary Notice with CFIUS no later than thirty days before the completion date of the transaction.[73] After the parties file a Joint Voluntary Notice, CFIUS commences an initial review phase that lasts up to 45 days.[74] During this review, CFIUS determines whether the transaction is within CFIUS's jurisdiction and whether the transaction poses risks to national security.[75] CFIUS may issue questions to the parties during the review period.[76]

If national security risks remain unresolved at the end of the review period, CFIUS will initiate a national security investigation, which is a separate 45-day phase.[77] As with the review period, CFIUS may issue questions to the parties during the investigation period.[78] During the investigation period, CFIUS may determine that national security risks require a mitigation agreement to address any outstanding national security concerns. An NSA is one common type of mitigation measure.[79]

---

[72] JX-1950 at 5, 8; JX-1974 at 8–9.

[73] JX-1950 at 6; JX-1974 at 9–10.

[74] JX-1950 at 6; JX-1974 at 10.

[75] JX-1950 at 5.

[76] *Id.*; JX-1974 at 10.

[77] JX-1950 at 7; JX-1974 at 10.

[78] JX-1974 at 10.

[79] JX-1950 at 7; JX-1974 at 11.

Desktop's expert, Mosman, explained, "[m]itigation measures can be used to address a range of national security risks" and "transaction parties may be required to take a variety of actions."[80]  Those actions can include:

> instituting a board director or monitor; complying with periodic reporting requirements; conducting third-party audits and/or monitors; conducting on-stie compliance reviews; prohibiting the transfer or sharing of certain types of information; establishing controls with respect to U.S. government work, including assuring supply to U.S. government customers; ensuring that computer networks are segregated; ensuring that certain facilities, equipment, or operations are located in the United States and/or are not moved from their current location; imposing restrictions on hiring and contracting with third parties; requiring notice to the US Government before making certain business decisions, and establishing mechanisms to limit foreign influence and ensure compliance; among other things.[81]

The parties recognized that CFIUS might impose significant mitigation requirements given Desktop's work in sensitive domains like "the nuclear space . . . missiles and satellites" that involve "controlled" areas and require U.S. citizen access restrictions.[82]  In Mosman's words, this was a "high risk transaction" involving "critical technology, tons of U.S. government contracts, and an entire acquisition by an Israeli company[.]"[83]  Nogueira similarly testified that both parties anticipated the

---

[80] JX-1950 at 4.

[81] *Id.* at 7–8.

[82] Trial Tr. at 502:14–20 (Fulop).

[83] *Id.* at 646:5–14 (Mosman).

17

sort of mitigation measures that appear in the NSA.[84] Such terms were "foreseeable" to the parties.[85]

Given Desktop's focus on deal certainty, Desktop required one of two things: a reverse termination fee if Nano declined to accept CFIUS mitigation measures, or a "hell or high water" efforts obligation requiring Nano to take all action necessary to obtain CFIUS approval.[86] Nano opted for the latter, agreeing to the hell-or-high-water provision.[87]

The parties agreed on an exception to the hell-or-high-water provision: a carveout for what Nano described as a "narrow set of circumstances" where CFIUS forces Nano to relinquish control of 10% of Desktop, measured by revenue (the "10% Carveout").[88] The parties defined "control" in the agreement as "the power to direct

---

[84] *Id.* at 33:2–7 (Nogueira).

[85] *Id.* at 642:1–5 (Mosman).

[86] JX-509 at 12–13 (4/26/24 email from Nano's counsel to Desktop's counsel with an attachment showing the progression of negotiations that led including a "hell or high waters" provision instead of a reverse termination fee); *see also* JX-596 at 7 (6/10/24 email from Nano's counsel to Desktop's counsel listing as an outstanding issue "[i]nclusion of a Parent hell or high water covenant for CFIUS approval"); JX-604 at 8–9 (6/11/24 email from Nano's counsel to Desktop's counsel proposing that Nano would "[a]gree to HOHW on HSR and CFIUS" with a carve-out); Trial Tr. at 12:10–14:4 (Nogueira); *id.* at 438:11–441:18 (Nedivi).

[87] JX-616 at 46.

[88] JX-647 at 117 (6/27/24 email from Nano's counsel to their client attaching the draft merger agreement they sent across to Desktop's counsel, in which they describe the "actions that limit the Parent Board's control over a percentage of the business exceeding 10%" as "a narrow set of circumstances"); *see also* JX-602 at 3 (6/10/24 email from Desktop's counsel inquiring about Nano's proposed language concerning the 10% Carveout); *id.* at 1 (6/10/24 email from Nano's counsel stating that they intended for this language to contemplate the mitigation measures that could be required by the government); JX-680 at 9 (6/29/24 email from Desktop's counsel with

18

the management and policies," contemplating situations where CFIUS would require Nano to cede control of a portion of the business to government-appointed directors or officers.[89] The parties intended this exception to be limited to extreme scenarios where CFIUS might require a ring-fenced subsidiary with independent governance.[90]

The hell-or-high-water commitment incorporated a list in Schedule 6.7(b) of "Required Actions," or commonly imposed mitigation remedies that the parties agreed would not implicate the 10% Carveout under any circumstances (the "Required-Actions Exception").[91] The list included supply assurances, manufacturing location restrictions, guidelines and terms for U.S. government contracts, product integrity safeguards (including as to "software"), information protections, notification and consultation, monitoring, and audits, among other actions.[92]

Nano also agreed that "any condition imposed in connection with the CFIUS Approval with respect to a board of directors or other governing body" would not

---

a proposed "list of remedies that would be deemed not to limit parent control"); Merger Agr. § 6.7(b).

[89] Merger Agr. at 56.

[90] JX-3204 at 1 (6/10/24 email from Nano's counsel stating "my understanding is that the mitigation agreement that could be required by the government can include agreements from Buyer regarding governance of the entities . . . . That could mean a subsidiary board that does not answer to the Parent Board but rather is self governing").

[91] Merger Agr. § 6.7(b); *id.* at 179, Parent Disclosure Schedule § 6.7(b); *see also* JX-681 (email thread in which counsel for the parties discussed the list to be included in Parent Disclosure Schedule Section 6.7(b)); Trial Tr. at 110:19–24 (Nogueira).

[92] Merger Agr. at 179, Parent Disclosure Schedule § 6.7(b); JX-680 at 5–9.

trigger the 10% exclusion as long as Nano could still elect a majority of the directors to that board or other governing body.[93]

### 2. Relevant Covenants, Conditions, And Information Rights

Nano bargained for interim covenants "Relating to Conduct of [Desktop's] Business" in Article V and the "Covenant-Compliance Condition" of Section 7.2(b), which conditions closing on Desktop having "performed or complied in all material respects with the obligations and covenants required to be performed or complied with by it under this Agreement at or prior to the Closing Date" (the "Covenant-Compliance Condition").[94] Nano further bargained for the right to terminate the Merger Agreement if Desktop "failed to perform any of its covenants or agreements" contained in the Merger Agreement.[95]

Of note, Nano secured the following interim covenants:

- The "Ordinary-Course Covenant," requiring that Desktop "use commercially reasonable efforts to (x) conduct its business in the ordinary course consistent with past practice in all material respects; and (y) preserve intact its business organization and advantageous business relationships" with "its current officers and key employees," and customers and suppliers.[96]

- The "Receivables/Payables Covenant," providing that absent Nano's consent, Desktop could not "change or modify in any manner [its] existing credit, collection and payment policies, procedures and practices in respect to accounts receivable and accounts payable."[97]

---

[93] Merger Agr. § 6.7(b).

[94] *Id.* § 7.2(b).

[95] *Id.* § 8.1(d).

[96] *Id.* § 5.1(a).

[97] *Id.* § 5.1(b)(vi).

20

- The "Transaction-Expenses Covenant," prohibiting Desktop from incurring Company Transaction Expenses exceeding $15 million.[98]

Given Desktop's financial state, the parties also negotiated over risks associated with Desktop's cash management and potential insolvency. Nano proposed a solvency representation in the May 28 draft of the Merger Agreement, which Desktop unequivocally stated was "not acceptable" given the "very unusual mechanism to adjust the price of the transaction."[99] Nano pushed for it again on June 3.[100] Ultimately, Nano agreed to exclude a solvency representation from the Merger Agreement.[101]

In lieu of a solvency representation, Nano secured financial conditions to closing. Of note, Nano secured a condition requiring that Desktop not "have experienced a Bankruptcy" (the "No-Bankruptcy Condition").[102] The Merger Agreement defined "Bankruptcy" as five different actions, including Desktop's "admi[ssion] in writing its inability to pay its debts as they mature."[103] Nano also

---

[98] *Id.* § 5.1(b)(xx).

[99] JX-556 at 4.

[100] JX-565 at 3.

[101] JX-604 at 7 (6/11/24 email from Nano's counsel attaching an issues list reflecting that Nano agreed to remove the solvency representation "subject to agreement on operation of business covenant and loan term sheet"); *see also* JX-946 at 79; *compare* JX-553 at 36 (5/28/24 email from Nano's counsel sending a draft merger agreement that included a solvency representation), *with* JX-616 (6/12/24 email from Nano's counsel sending a draft merger agreement that does not include a solvency representation).

[102] Merger Agr. § 7.2(d).

[103] *Id.* § 8.1(g).

secured a condition that Desktop reduce its quarterly cash burn below $20 million, or $6.67 million per month (the "Cash-Flow Condition").[104]

Nano further secured information rights, including rights to cash reporting[105] and rights requiring that Desktop "furnish promptly" to Nano "information concerning its business . . . as [Nano] may reasonably request" (the "Buyer Information Rights").[106]

### 3. Bridge-Loan Provision

The parties contemplated that Desktop might require additional cash if regulatory approvals extended closing. They therefore negotiated an agreement for Nano to provide Desktop a multi-draw bridge loan of up to $20 million beginning in January 2025 (the "Bridge Loan").[107] Desktop's counsel remarked that the loan provided "comfort that if regulatory review lengthened the interim period then we could safely make it through to close the deal."[108] The parties memorialized this agreement in a term sheet. The Merger Agreement required the parties to "cooperate in good faith" to negotiate and execute definitive documentation regarding the Bridge Loan promptly, but no later than 30 days after the signing of the Merger Agreement.[109]

---

[104] *Id.* § 8.1(f).

[105] *Id.* § 5.5(a).

[106] *Id.* § 6.5.

[107] *Id.* § 6.15.

[108] JX-512 at 4; JX-711.

[109] Merger Agr. § 6.15.

The term sheet provides for the definitive documentation to include representations and warranties, covenants, and events of default that are "[c]ustomary for a facility of this type" and could "incorporat[e] all relevant representations, warranties and business operation covenants applicable to [Desktop] contained in the Merger Agreement."[110] The term sheet enabled Desktop to request draws of $4.25 million per month starting January 7, 2025.[111] If Desktop drew the entire $20 million, then the $5.50 per-share purchase price would be reduced by $0.80.[112]

### E. The Companies Work Toward A Q4 Closing.

After signing the Merger Agreement, the companies pursued three activities in parallel——regulatory approval (including CFIUS approval), post-merger integration ("PMI"), and negotiations over the Bridge Loan. The companies' interactions were largely collaborative and productive during this period.

#### 1. The Companies Collaborate On CFIUS Approval.

The regulatory approval team comprised Desktop counsel Latham & Watkins and Nano counsel Greenberg Traurig.[113] On June 19, Nano sent Desktop a draft Joint Voluntary Notice to CFIUS, which initiated the review process.[114] The parties filed

---

[110] *Id.* at 116.

[111] *Id.* at 115.

[112] JX-694 at 7.

[113] *See, e.g.*, JX-776.

[114] JX-776 at 5; JX-1974 at 16 ¶ 9.

the draft CFIUS Notice on August 5, 2024.[115]  The parties then filed their formal Notice on August 14 after receiving CFIUS's comments.[116]

CFIUS informed the parties on August 27 that its initial 45-day review would conclude by October 10.[117]  On October 10, CFIUS informed the parties that its "investigation will be completed no later than November 25, 2024."[118]  On October 2, Desktop obtained stockholder approval for the Merger.[119]  The "only remaining condition to closing was CFIUS approval"[120] and the parties anticipated closing by no later than the end of 2024.[121]

### 2. The Companies Plan For Post-Merger Integration As Desktop's Cash Situation Evolves.

The PMI team comprised a "cross-section" of leaders from the two companies selected based on their expertise.[122]  Nano President Zivi Nedivi led the process and retained Price Waterhouse Coopers ("PwC") to advise on integration.[123]  Other team members included Nano CFO and COO Tomer Pinchas, CTO Nick Geddes, and Chief Revenue Officer Dale Baker, as well as Desktop's COO Tom Nogueira.[124]

---

[115] JX-825.

[116] JX-835; JX-838; JX-847.

[117] JX-890 at 2.

[118] JX-1031 at 3.

[119] JX-3325 at 1.

[120] Pinchas Dep. Tr. at 183:3–14.

[121] JX-1214 at 7.

[122] Trial Tr. at 16:17–21 (Nogueira).

[123] *Id.* at 15:8–16, 16:19–23 (Nogueira).

[124] *Id.* at 15:20–17:19 (Nogueira).

24

The PMI team worked diligently on "developing and executing plans for what would be [their] day 1 focus," where "day 1" meant the day the Merger Agreement closed.[125] The team were targeting a day 1 "sometime in Q4 of 2024."[126] Starting in early July, they worked nights and weekends toward this goal while still performing their day jobs.[127] During the process, Nedivi set a "north star" of "driving toward profitability in Q4 of 2026."[128]

In addition to Nedivi's "north star" of profitability by Q4 of 2026, recall that the Merger Agreement included the Cash-Flow Condition requiring that Desktop reduce its quarterly cash burn below $20 million, or $6.67 million per month.[129] Pre-merger, Nano expected that Desktop's average quarterly cash burn in 2024 would be $25 million.[130] Desktop had work to do.

Although Desktop got to work during the months post-signing, Desktop management became increasingly concerned about maintaining enough cash to reach closing.[131] According to Cole, Desktop's revenues had slowed due to "a drop-off in

[125] *Id.* at 18:4–6 (Nogueira).

[126] *Id.* at 18:21–22 (Nogueira); *see also* Nedivi Dep. Tr. at 38:22–39:5; JX-1252 at 3; JX-1214 at 7; JX-1307 at 3.

[127] Trial Tr. at 18:8–11 (Nogueira).

[128] *Id.* at 18:12–18 (Nogueira).

[129] Merger Agr. § 8.1(f).

[130] JX-610 at 18; Nedivi Dep. Tr. at 86:15–25.

[131] JX-748 (Cole writing in a draft of the 7/18/24 email that "[t]wo specific items have heightened the issues surrounding accelerated cash burn").

collections from new business."[132]  Cole worried that Desktop was on pace to trip the Cash-Flow Condition.[133]

On July 18, 2024, Cole sent an email to Desktop executives with the subject line "Prioritizing Cash."[134]  "[I]t's not a surprise that managing cash is a cornerstone priority for [Desktop]," he wrote, but it was "also becoming clear that this message may not be effectively cascading into our organization – and we need to prioritize and address this."[135]  He proposed reducing company spending by (i) stopping all non-essential business travel, (ii) canceling or pausing all contractor engagements, and (iii) freezing Desktop's corporate credit cards.  His general advice was: "[I]f it doesn't drive a known cash return on investment ($ROI), we need to stop doing it."[136]  At trial, Cole testified that his goal for the July 18 email was to "create a sense of urgency because [he] was getting signals that some of [his] people had lost their discipline" with respect to cash management.[137]

On July 30, 2024, Desktop added a going concern qualification to its 10-Q, disclosing "substantial doubt as to [its] ability to satisfy [its] obligations as they become due within one year from the date of filing[.]"[138]  Desktop fielded questions on

---

[132] *Id.*

[133] *Id.* (Cole explaining that "[i]f we . . . trip this covenant, it could compromise our deal . . . we are on a pace where tripping this covenant is possible").

[134] JX-801.

[135] *Id.*

[136] *Id.*

[137] Trial Tr. 409:12–411:7 (Cole).

[138] JX-672 at 48.

the company's cash burn during the July 31 earnings call.[139] In response, Cole stated that the second quarter cash burn was elevated due to "some cash outflows related to the [Nano] deal[.]"[140]

By August 1, 2024, Desktop Board member Stephen Nigro had started emailing Desktop executives unsolicited advice regarding cash management. He proposed: "stop[ping] all near-term hiring," "seriously question[ing]" investment in "new product[s] [which] do[] not show up with a return in the next six months," and holding off on purchasing additional inventory "unless it can be sold with high confidence in the next six months."[141] Nigro did not have authority to institute these measures. As Fulop confirmed at trial, the company in fact did not implement Nano's suggestions.[142]

Nano knew about much of Desktop's cash management issues as they were developing. Nano's information rights in the Merger Agreement entitled Nano to

---

[139] JX-806 at 7 (attendee asking "[o]bviously, another $20 million cash burn this quarter. And how should we be thinking about that? Is there may be increased focus or emphasis on that in the next couple of quarters? Maybe in the case that the deal does get pushed to '25 and a greater emphasis on driving down that cash burn").

[140] *Id.*

[141] JX-808.

[142] Trial Tr. at 526:23–527:10, 529:8–16 (Fulop) (testifying that while Nigro's advice was welcome and "very helpful to our company," Nigro did not run Desktop and that the company continued to make investments following his email that "had a longer-than-six-month ROI," including hiring additional sales employees).

monthly cash reports.[143]  Those reports did not reflect restricted cash, but they contained a great deal of information.[144]

Nano knew that Desktop's cash-management position was unsustainable, as an August 2024 email exchange reflects.  The Merger Agreement contained provisions regarding Desktop's ability to enter into contracts over $250,000,[145] and so Desktop requested Nano's approval to hire a sales executive whose salary would exceed that amount.[146]  Nedivi responded as follows: "With focus on sales this is approved[.]  Having said that, the burn rate is unsustainable, and we cannot wait for the PMI or closing to reduce it significantly."[147]  Nedivi instructed Nogueira: "Please start to put together an aggressive plan and we can discuss in Boston next week."[148]

As instructed, Desktop put together an "aggressive plan" for cash management.  During a Board meeting on September 13, 2024, Cole presented on Desktop's cash-management efforts.[149]  A slide titled "Cash Management" reflected that Desktop had lowered operating expenses, reduced balances of aged receivables, limited inventory purchases to items in demand, and offered product bundles as a

---

[143] Merger Agr. § 5.5; *see, e.g.*, JX-1021 (September and Q3 report); JX-1688 (December report); *see also* Trial Tr. at 22:11–23:3, 30:2–22 (Nogueira); *id.* at 466:5–467:5 (Pinchas).

[144] Trial Tr. at 63:6–64:12 (Nogueira).

[145] *See generally* Merger Agr., Article III.

[146] JX-836 at 5–6.

[147] *Id.* at 4.

[148] *Id.*

[149] JX-922 at 5.

way to delay payments to vendors and suppliers.[150] The slide states, however, that Desktop was "not adjusting payment terms" for its accounts receivables.[151]

Meanwhile, Nano continued to push Desktop to reduce its cash burn. Desktop provided Nano its September report on October 3. The report reflected a monthly cash use of ~$5.3 million—well under the cash-outflow covenant and reflecting a positive trend—and cash balance of ~$31 million.[152] Nano wanted a greater reduction. In response to the September report, Nano CFO Pinchas instructed Desktop: "let's have a plan to reduce the monthly cash burn below $4M prior to the PMI implementation."[153]

Despite the aggressive plan and positive trend, there were signs of Desktop's worsening position. Desktop knew that delaying closing could imperil the deal and alerted CFIUS to the urgency. On September 27, 2024, Fulop wrote to CFIUS that Desktop's cash situation had become "far more urgent,"[154] Desktop had "less than a quarter's worth of cash remaining," and "[a]ny undue delay in obtaining regulatory approval for this transaction will put Desktop Metal in serious jeopardy."[155]

---

[150] *Id.* at 11.

[151] *Id.*

[152] JX-1021 at 1.

[153] *Id.* Desktop ultimately executed. By January 3, 2025, Desktop reported to Nano that its cash outflow for December was $100,000, significantly below the company's November cash burn of $6.5 million. JX-1688 at 3; Trial Tr. at 414:5–7 (Cole). Nedivi responded with a rare compliment: "Thanks Mike Nice job." JX-1688 at 1; Trial Tr. at 31:3–9 (Nogueira).

[154] JX-989 at 1; *see also* JX-922 at 3.

[155] *Id.*

CFIUS responded on October 10 asking Desktop to report on its cash on hand position as of September 30 and projected positions as of month-end through February 2025.[156] After receiving the CFIUS request, Nogueira texted two other Desktop executives: "The cash question???" followed by "Hopefully to our benefit so they [CFIUS] see the situation."[157] Later in the conversation, Nogueira mused, "[t]his is a tricky one because how we'd answer CFIUS isn't exactly the message you want Nano to have, but Nano will see it all."[158] Desktop's general counsel responded "[w]e can make our answer confidential – Nano doesn't see it."[159]

Desktop submitted its response to CFIUS on October 15 confidentially—they did not share their response with Nano.[160] Desktop's response was geared towards prompting CFIUS to move quickly through the process. It stated:

> As of September 30, 2024, Desktop Metal has approximately $30.8M of cash and cash equivalents. Of that amount, approximately $9.3M has restrictions on use. These restrictions include cash required to be held for commercial leases and customer deposits, and amounts earmarked for transaction-related costs. Taking into account these restrictions, Desktop Metal's cash available for operations is approximately $21.5M. On average, Desktop Metal expects its net operating cash use to be between $3M-$6M per month, excluding interest payments due on convertible debt (paid in May and November each year). Because Desktop Metal's business is geographically dispersed, cash management will become increasingly difficult as its consolidated balance approaches $10M.

---

[156] JX-1051 at 8.

[157] JX-1039 at 1.

[158] *Id.* at 2.

[159] *Id.*

[160] Trial Tr. at 61:5–18 (Nogueira).

> Resultingly, Desktop Metal will likely have inadequate operating funds to manage the business day-to-day even before its cash balance reaches zero. Desktop Metal's total available closing balance is expected to fall below $10M by November 2024.[161]

The response also included a chart projecting that Desktop would have a negative cash balance as of February 2025.

Desktop wrote to CFIUS on November 24, again to express urgency. Once again, Desktop did not share this communication with Nano.[162] Desktop stated that "Desktop Metal's cash flow projections from October have proven accurate through November, and Desktop Metal anticipates entering December with approximately $9 million in available cash on a consolidated basis."[163] Desktop also stated that "[a]ccounts receivable and inventory conversion to cash have become increasingly unpredictable[.]"[164] The message further warned that Desktop's "risk of triggering a bankruptcy . . . [was] escalating weekly" and noted that any declaration of bankruptcy would give Nano "the right to terminate the proposed transaction."[165]

In its November 24 communication, Desktop also indicated that it was "facing significant talent attrition, having lost over 50% of key U.S. technical staff, including [almost 100] engineers, software developers, and researchers, in the past year."[166] It

---

[161] JX-1051 at 9.

[162] Trial Tr. at 64:22–67:7 (Nogueira).

[163] JX-1782 at 4.

[164] *Id.*

[165] *Id.*

[166] JX-1782 at 6; Nogueira Dep. Tr. at 259:2–260:3.

is unclear how accurate this statement was at the time,[167] but it is true that Desktop had lost technical staff and key employees post-signing, including its CIO, CMO, and the President of Desktop Health.[168]

As part of the post-Merger integration process, Nano and Desktop were also planning on conducting a combined company audit after the transaction closed, instead of having Desktop perform its own standalone year-end audit.[169] As a result, Desktop held off on engaging its usual auditor, Deloitte, with the intent that the post-close audit would be performed by Nano's auditor, KPMG.[170]

But as the year progressed, Desktop's cash position became increasingly precarious, and the company began attempting to negotiate longer payment terms with its key vendors. On November 20, Nogueira told a vendor that Desktop was "hoping to be able to make [a payment on] Friday or Monday, but we can't confirm until we have clarity on the closure timing for our acquisition. Our cash position right now is day to day and a difficult situation to say the least."[171] A similar exchange occurred on December 9. A Desktop employee forwarded an email chain with a

---

[167] Nogueira later testified that Desktop had lost 50 employees total out of 95 technical staff. *See* Nogueira Dep. Tr. at 529:1–2.

[168] JX-1801 at 23–24.

[169] JX-1202 at 48 (11/19/24 Nano presentation regarding post-Merger integration stating, "Audit—KMPG to audit combined company").

[170] JX-3210 (12/4/24 email from Nano introducing its "audit partner from KPMG" to Desktop personnel); JX-3214 at 2 (email exchange between KPMG and Desktop regarding ongoing inventory counts).

[171] JX-1227 at 1 (11/20/24 email from Nogueira to Align Tech regarding a $492,000 payment); *id.* (Nogueira continuing, "I assure you this is a priority and one of the reasons the $208K was sent on Monday. We wanted to send what we could.").

vendor regarding $95,000 in past due invoices.[172] The employee asked, "[a]ny way we could work a few of these into this week's check run? We could knock out a few of the really small ones in the middle of the list so that we clear out some volume of outstanding invoices without much cash going out the door."[173] Desktop's failure to timely pay its vendors strained at least one of the vendor relationships.[174]

By January 10, Desktop's cash burn had become so limited that it was refusing to enter a forbearance agreement that one of its unpaid vendors had proposed over a month earlier. Desktop feared that doing so would "conflict with our merger agreement with Nano" by triggering the bankruptcy provision that would allow Nano to terminate the deal.[175] Accordingly, Desktop has had several conversations in recent months with attorneys concerning its solvency, ultimately resulting in Desktop considering retaining bankruptcy counsel.[176]

---

[172] JX-4035.

[173] *Id.* at 1.

[174] JX-4137 at 1. On February 3, 2025, Steffan Industries reached out regarding Desktop's "delinquent balance of $23,963.15" for unpaid invoices dating back to November. Steffan informed Desktop that it had "no choice but to suspend all services to Desktop until the balance listed above has been paid in full" and warned that if Steffan had not received payment by end of day on February 5, the company's attorney would "begin the collections process." The vendor further criticized the payment strategies Desktop was considering (and apparently implemented) as of early December, stating "[t]he transaction statement is interesting as it indicates Desktop's payments for small invoices while the larger invoices are left to significantly age. Payment of 1 small invoice here and another there will not protect the credit terms we have extended."

[175] JX-4086 at 1.

[176] Cole Dep. Tr. at 182:12–183:4; Jordan Dep. Tr. at 100:1–6; Nogueira Dep. Tr. at 49:13–23.

33

### 3. The Companies Negotiate Bridge Loan Documentation But Reach An Impasse.

Recall that the Merger Agreement required the parties to "cooperate in good faith" to negotiate and execute definitive documentation regarding the Bridge Loan no later than 30 days after the signing of the Merger Agreement.[177]

Toward that end, Nano sent Desktop a draft Bridge Loan agreement on August 4.[178] Nano followed up on August 12 and August 20 requesting comments.[179] Desktop responded that it was "working with a very lean team" and "there is no pressing deadline on the bridge loan."[180]

On September 12, Desktop provided a markup and requested the parties finalize all documentation by Desktop's October 2 shareholder vote on the merger.[181] Nano responded it would "push to that timing."[182] Nano circulated revisions on September 23,[183] and further comments on September 26.[184] These drafts accepted several of Desktop's edits and proposed compromises on others,[185] while additional points remained for negotiation.

---

[177] Merger Agr. § 6.15.

[178] JX-863 at 2.

[179] *Id.* at 1–2.

[180] JX-877 at 1.

[181] JX-919 at 1.

[182] JX-934.

[183] JX-957.

[184] JX-987.

[185] JX-1940 ¶¶ 108, 110, 113.

On September 25, Desktop requested that the agreement's covenants be "springing"—triggered only upon Desktop's draw on the facility, rather than signing.[186] Nano rejected the springing covenants as contrary to the agreement's fundamental terms, emphasizing that if Nano "commit[ted] to lend, the loan agreement, including the covenants, should be binding."[187] Desktop responded that "[t]he business ask isn't going to change."[188]

On September 27, Desktop determined to cease negotiations over the Bridge Loan documentation. The reality was that, although the Merger Agreement required the parties to execute definitive documentation, it did not require Desktop to draw on the loan.[189] And Fulop testified that, even before signing, Desktop had decided that it would not avail itself of the Bridge Loan.[190]

### F. Murchinson Seizes Control Of Nano.

#### 1. Murchinson Nominates Directors In Opposition To The Desktop Deal.

After Nano's Board approved the Merger Agreement, Murchinson launched a proxy contest premised primarily on Nano's opposition to the Desktop merger.

---

[186] JX-967.

[187] JX-985.

[188] *Id.*

[189] Merger Agr. § 6.15 (Desktop's "request" would trigger the bridge loan).

[190] Fulop Dep. Tr. at 68:19–69:3, 70:4–9, 304:11–15, 310:11–17, 312:3–13, 322:20–323:1.

Murchinson notified Nano of its intention to nominate directors for the December 2024 stockholder meeting on October 9, 2024.[191] Murchinson later nominated Ofir Baharav and Bob Pons for election.[192] Baharav was a Nano director from 2015 to 2021, including as Chairman from 2019 to 2021. Pons was an experienced executive and a career director, having served on more than sixteen public company boards.[193]

In a press release announcing the proxy contest, Murchinson cited the "overpriced, misguided acquisition[] of Desktop" as a basis for its campaign.[194] Ahead of the annual meeting, Murchinson propounded a stockholder proposal to disapprove of Nano's M&A strategy.[195] A November 10, 2024 presentation reflected Murchinson's position that there was "Urgency" to stop Nano's "plans to spend over . . . acquiring" Desktop, which Murchinson priced at $400 million.[196]

Murchinson continued to champion the proposal that Traub made at the July 2 board meeting—to purchase Desktop out of bankruptcy. According to Murchinson, Desktop could be purchased for 50 cents on the dollar out of bankruptcy instead of the premium paid in the Merger.[197] On October 23, Murchinson's Sarfaty introduced

---

[191] JX-1029 at 13.

[192] JX-1085.

[193] *Id.* at 2.

[194] *Id.*

[195] JX-1135; JX-3230.

[196] JX-1163 at 19–20.

[197] *Id.* at 44.

Baharav to a Murchinson analyst, Gurdeep Janjua, who was tasked with showing "how value-destructive the Desktop . . . acquisition" was.[198]   Janjua later sent Baharav an analysis stating that "buying Desktop Metal ACCELERATES the destruction of shareholder value."[199]   On November 10, Baharav developed a slide deck that went even further, titling it "Reckless & Astronomical Valuations . . . for [Desktop]" and suggesting that the Nano board should have "negotiate[d] a structured Chapter 11" to acquire Desktop.[200]

Murchinson and its director nominees continued advocating for this strategy throughout November.   Murchinson's talking points for a November call with ISS included that the Nano "Board had a lower cost route, structured ch. 11, [but] didn't take it."[201]   And Baharav sent multiple communications to Pons stating "if we buy why not do a structured chapter 11."[202]

### 2.   Murchinson Identifies A Lack Of CFIUS Approval As A Means To Defeat The Deal.

The problem with Murchinson's plan for Nano to purchase Desktop out of bankruptcy was that Nano had already agreed to purchase Desktop pursuant to the Merger Agreement.   Murchinson needed a way out of that agreement.

---

[198] JX-1078 at 1.

[199] JX-1116 at 1, 10.

[200] JX-3364 at 1, 5; *see also* Trial Tr. at 288:7–296:18 (Baharav).

[201] JX-3162 at 4.

[202] JX-1128 at 4; JX-1305 at 3.

By November, Murchinson had identified the lack of regulatory approval as a potential off-ramp. On November 1, Baharav directly emailed Janjua asking "where is nano in the process of the acquisitions when is the closing when is the sec, ftc, doj."[203] An internal Murchinson document dated November 6 contained allegations connecting Nano's management and Russian oligarchs, a potential concern for CFIUS.[204] On November 7, an article appeared in Real ClearMarkets titled "Close CFIUS Due Diligence Is Necessary Ahead of Desktop Metal's Acquisition," containing the exact same allegations connecting Nano's management and a sanctioned Russian oligarch.[205] Nano's PR advisors characterized this as an "egregious conspiracy theory" leaked by Murchinson specifically for "jeopardizing" the Desktop merger.[206]

Murchinson issued a press release on November 12 attaching a presentation titled "Save Nano Now," calling for "[m]eaningful change to the Board . . . to prevent further value-destructive M&A," and specifically criticizing the decision to acquire Desktop, "a lower margin, cash-burning business with decelerating revenue growth."[207] The presentation linked Murchinson's opposition to potential regulatory issues, asserting that CFIUS review "create[s] significant risk that additional information damaging to Nano's value will come to light."[208]

---

[203] JX-1116 at 1.

[204] JX-3035 at 51.

[205] JX-1148.

[206] JX-3138 at 1.

[207] JX-1170 at 1, 3, 17, 43.

[208] JX-1170 at 57.

### 3. Murchinson Gains Influence And The CFIUS-Approval Process Begins To Slow Down.

On November 21, 2024, an Israeli court ruled that the two Murchinson-nominated board observers (Traub and Rosensweig) had been properly elected as full directors on Nano's board.[209]

The next day, Desktop and Nano received CFIUS's first draft NSA.[210] The draft included restrictions on manufacturing locations for products supplied to the U.S. Government, limitations on the use of "remote access" software in such product, and a non-voting board observer.[211] The draft also included an effectiveness provision stating that the obligations imposed by the NSA would take effect immediately upon the Effective Date, meaning the date on which the parties enter into the NSA.[212]

The federal stakeholders involved in the CFIUS approval process arranged their schedules to be available for a call with the parties that afternoon to quickly finalize the agreement.[213] Understanding the time pressure, CFIUS requested that the parties set up a call for the following Monday as well.[214]

Desktop, on the one hand, responded promptly to the draft NSA, informing Nano on November 24 that Desktop was prepared to accept the draft "as is."[215]

---

[209] *See* Trial Tr. at 503:1–15 (Fulop); JX-1231 at 4.

[210] Trial Tr. at 33:8–21, 109:11–13 (Nogueira); JX-1239.

[211] JX-1239 at 9, 13–16.

[212] *Id.* at 1, 31.

[213] Trial Tr. at 503:16–504:7 (Fulop); JX-1249.

[214] JX-1249 at 2.

[215] JX-1254 at 2; Trial Tr. at 34:14–18 (Nogueira).

Nano, on the other hand, sought to buy time. On November 26, CFIUS requested a status update and offered to have a call later that afternoon. In response, Nano informed CFIUS that it would not be able to provide a written response to the NSA that day and did not provide a date certain by when it would.[216] Nano ultimately stated that it might take more than a week to respond to the November 22 draft.[217] In response, counsel for Desktop wrote to Nano threatening to sue to enforce the hell-or-high-water provision.[218]

CFIUS reached out to the parties on November 29, the day after Thanksgiving, again requesting a status update and offering to have a call the following Monday.[219] The next day, Nano's counsel informed Desktop's counsel that Nano wanted the lawyers to speak with CFIUS on Monday, December 2, before exchanging redlines.[220] Nano rejected Latham's request to provide to CFIUS a written list of its concerns with the NSA draft in advance of the call.[221]

Ultimately, two days before its annual stockholder meeting, on December 4, Nano shared its requested redlines with CFIUS.[222] The modifications were relatively targeted. With respect to the manufacturing locations, software, board observer, and

---

[216] JX-1290 at 1–2.

[217] JX-1276 at 2.

[218] *Id.*

[219] JX-1314 at 1.

[220] JX-1316 at 1.

[221] JX-1319 at 1.

[222] JX-1362 at 1.

effective date provisions, Nano proposed two changes to the November 22 draft. First, Nano proposed using the term "Combined Company" instead of "Transaction Parties."[223] Nano sought this change because it "intend[ed] to integrate the operations of Nano and [Desktop] in the United States" and was planning on operating the two companies "as a single operation to ensure the continued economic viability of the post-closing company."[224] Second, Nano sought to limit attendance of the board observer to Board meetings relating to U.S. Government customers, the Covered Products or Covered Services, or the NSA.[225] Nano relied on the board observer requirement in striking a third-party monitor provision, noting the "several layers of protection and compliance monitoring" already in the NSA, including an "independent board observer."[226]

Nano conceded at trial that it was prepared to agree to the redline version of the NSA that it shared with CFIUS on December 4.[227]

### 4. Murchinson Wins The Proxy Contest And Plans To Suspend The Desktop Deal.

At the annual meeting December 6, Murchinson won another two board seats, and Baharav and Pons joined the Nano board.[228]

---

[223] *Id.* at 18–20, 24–28.

[224] *Id.* at 14.

[225] *Id.* at 26–27.

[226] JX-1362 at 36.

[227] Trial Tr. at 175:24–176:7 (Lederman).

[228] *Id.* at 121:10–122:9, 124:16–125:5 (Lederman).

In the days leading up to the December 6 meeting, the Murchinson nominees and directors were planning specific actions to prevent the Merger. On November 26, Baharav sent a list of draft "Board actions" to Pons that explicitly included "[s]uspension of deals until the board understands . . . if we buy why not do a structured chapter 11."[229] On December 2, Baharav sent Sarfaty a proposed agenda for the Nano board meeting, including having new Nano directors inquire into "CFIUS approval and legal situation with sanctioned oligarch" and "M&A: (i) Legal status."[230]

After the December 6 meeting, Baharav got to work quickly. On December 8, Baharav prepared: "Target Resolutions," starting with "Instruct said CEO to not close the M&As until the board understands merger strategy."[231] The next day, he set out the new directors' priorities: "1. Minimize the board. 2. Suspend [CEO Yoav Stern] and the deals."[232] Traub and Pons replied: "all agreed."[233]

By December 16, following the threat of personal legal exposure from claims by Murchinson,[234] the six legacy directors resigned.[235] Their departure left the four

---

[229] JX-1128 at 4; *see* Trial Tr. at 329:6–330:15 (Baharav).

[230] JX-1322. At trial, Baharav testified that he rejected Sarfaty's "multiple solutions" to "exit the deal" with Desktop as "illegal" and "crazy," Trial Tr. at 274:21–275:3 (Baharav), but that testimony does not square with the contemporaneous communications.

[231] JX-1393 at 7.

[232] JX-1402 at 1.

[233] *Id.*

[234] JX-1427 at 2–3; Trial Tr. at 342:10–21 (Baharav).

[235] PTO ¶ 45; JX-1482 at 2.

Murchinson-appointed directors as sole members of Nano's board.[236]   In early February 2025, Davis Stehlin replaced Traub, who had moved on to run another company.[237]   The Nano board from December 16 onward comprised Chair Baharav and directors Rosensweig, Pons, and Traub (later replaced by Stehlin).[238]

The new board started terminating Nano executives, seeming to focus on those who supported the Merger.  The board fired CEO Stern on December 26.[239]   That same day, Pons emailed Pinchas that Nano was "considering ending [his] employment[,]" including because he "attempt[ed] to coerce the board's support" of "the DM and MF M&A[.]"[240]   By December 31, Nedivi was negotiating the terms of his separation.[241]   And on February 7, Nano handed Chief Revenue Officer Dale Baker a letter of termination when Baker attempted to resign.[242]   By the end of the purge, none of the Nano PMI team members remained in their positions.

Nano's VP of Corporate Governance, Julien Lederman, survived the regime change.  Lederman had years of experience leading Nano's corporate development, including with respect to Nano's M&A analysis and investor relations.[243]   Lederman

---

[236] *See* JX-1452; JX-1397.

[237] Baharav Dep. Tr. at 37:4–38:4; Trial Tr. 179:20–180:7 (Lederman).

[238] PTO ¶ 46.

[239] JX-1604.

[240] JX-1596 at 1.

[241] JX-1635 at 2; Nedivi Dep. Tr. at 263:14–264:9 (testifying the negotiations slowed and he has continued consulting with the company).

[242] Baker Dep. Tr. at 14:2–20.

[243] Trial Tr. at 116:7–13 (Lederman); Stern Dep. Tr. at 42:6–14.

had opposed the Desktop deal from the outset. In June, Lederman had sent a memo to Nano executives Stern, Pinchas, and Nedivi setting out the cons of the deal prior to the Merger Agreement.[244]

In his initial interview with the Murchinson board after the December 6 meeting, the board asked Lederman whether he had prepared any analysis to the Desktop merger. He directed them to his June memo.[245] The board then appointed him interim CEO.[246]

In briefing and at trial, Nano tried to distance Murchinson's board nominees from Murchinson, but the record reflects that they acted as a unit in furtherance of Murchinson's goals. As early as November 26, 2024, Baharav schemed with Pons about how "[t]ogether" they would "turn this company around."[247] Before the remaining directors resigned, Baharav sent communications regarding board strategy to Rosensweig, Traub, and Pons, addressing them as a "[t]eam."[248] Before sending proposed agenda items to the full board, Baharav ran his proposals by Pons,

---

[244] JX-610.

[245] JX-1495.

[246] Trial Tr. at 116:1–3, 116:14–22, 179:11–19 (Lederman); Lederman Dep. Tr. at 61:16–22, 196:16–197:6; *see also* JX-1571 (Traub requesting and scheduling a "1:1" with Lederman); JX-1595 at 2 (referring to Nano's "CEO change"); JX-1610 at 2 (Lederman's email signature includes his position as "Interim CEO").

[247] JX-1128 at 4.

[248] JX-1430 at 2; JX-1397 at 2.

Traub, and Rosensweig. Those proposals included "[s]uspend[ing] . . . the deal."[249] The Murchinson-appointed directors' intent to sabotage the Merger was apparent.

### G. Desktop Sues Nano To Enforce The Merger Agreement.

On December 10, CFIUS sent responses to the draft NSA, but Nano was in total upheaval and did not provide any feedback or a certain date when it would.[250] On December 16, Desktop filed this suit seeking specific performance of Nano's closing obligation, including its hell-or-high-water obligation to obtain CFIUS approval by signing the NSA.[251]

As is common in broken-deal cases, Desktop moved to expedite the case on a schedule that would allow for final resolution before the extended March 31, 2025

---

[249] JX-1402 at 1, 3.

[250] Trial Tr. at 37:11–16 (Nogueira); JX-1436 at 1–2 (Desktop's counsel following up with Nano's counsel twice concerning CFIUS's December 10 draft).

[251] On September 25, 2024, Nano agreed to acquire another 3D printing company, Markforged Ltd. JX-964. The acquisition would add significant sales and marketing firepower for the post-merger integrated company, but Nano expected needing 300 to 400 layoffs. Trial Tr. at 26:23–27:22 (Nogueira); *id.* at 500:23–501:13 (Fulop). Desktop worked diligently alongside Nano and Markforged on the PMI planning required to consolidate the three companies. Nedivi Dep. Tr. at 168:23–170:3; JX-955 at 3–4. To address any antitrust concerns, Desktop and Nano informed CFIUS in October 2024 that Desktop "has very little overlap with Markforged products." JX-1026. In December, however, the DOJ's Antitrust Division issued civil investigation demands to Desktop regarding antitrust issues arising out of Nano's Markforged acquisition. Desktop then filed a new suit, claiming that Nano closing the Markforged deal before the Desktop deal would breach the "clear skies" provision in Section 6.7(e) of the Merger Agreement. The court consolidated the Markforged action with this suit, and the parties went to trial on the Markforged claims. The court will address those claims, including post-trial updates submitted by the parties, in a separate letter decision.

45

deadline.[252]   In an apparent effort to drag out the litigation, Nano opposed this request.   Nano argued that "ample time remain[ed]" to obtain CFIUS approval because the parties' "bargained-for closing deadline is not until March 31, 2025, and [Desktop] ha[d] not availed itself of the Bridge Loan."[253]

### H.   Desktop Delays The CFIUS-Approval Process For 38 Days.

Eight days after Nano received the December 10 CFIUS draft NSA, on December 18, the new Nano board asked Lederman to review the draft through a "fresh pair of eyes."[254]   Lederman had no prior CFIUS experience and had been "hardly involved" in the post-merger integration process.[255]   He reviewed the NSA "without regard to what was in the merger agreement" and acknowledged at trial that he had never read the Merger Agreement's list of mitigation measures (the Required Actions) that Nano was contractually obligated to accept.[256]

Lederman proceeded to spend 30 additional days—for a total delay of 38 days—preparing a mark-up of the agreement.   Nano retained litigation counsel and a

---

[252] Dkt. 4.

[253] Dkt. 18 ¶¶ 5, 19; *see also* Dkt. 45 at 26:2–5 (Nano counsel stating that the parties had a "long runway" from the December 30, 2024 Motion to Expedite Hearing to March 31, 2025).

[254] Trial Tr. at 177:3–6 (Lederman); *see also* JX-1499 at 2.

[255] Trial Tr. at 175:3–6, 176:12–22, 177:13–18 (Lederman).

[256] *Id.* at 178:4–13, 188:19–189:15, 209:1–24 (Lederman).

testifying expert, who aided Lederman in his review.[257] Nano shielded most of Lederman's work during that period from discovery by privilege assertions.[258]

CFIUS's December 10 draft had barely made any changes to the manufacturing locations, software restrictions, board observer, and the effective date provisions in the December 4 draft Nano endorsed. Lederman's efforts, however, resulted in a heavy redline of the December 10 draft. Lederman sent the redline to Baharav for review before Nano's counsel at Greenberg Traurig sent it to CFIUS on January 17, 2025.[259]

Nano did not communicate substantively with Desktop or CFIUS regarding the NSA during the 38-day period, despite follow-ups from CFIUS and Desktop on December 12, 15, 17, 19, 20, 22, 23, 26, 27, 30, and January 2 and 6.[260]

## I. Nano Asserts Counterclaims And Desktop Amends Its Complaint.

While Lederman was reviewing the NSA with fresh eyes, Nano was developing counterclaims to assert in this litigation. On January 8, 2025, Nano filed its Answer to the Verified Complaint and Verified Counterclaim.[261] Nano's single counterclaim alleged that Desktop had failed to provide Nano with financial information it had

---

[257] Trial Tr. at 180:18–8 (Lederman); JX-4163 at 1–2; Solomon Dep. Tr. at 37:10–38:17, 41:19–24, 110:20–111:14.

[258] *See, e.g.*, JX-1550; JX-1643; Trial Tr. at 180:16–19 (Lederman).

[259] JX-1643.

[260] JX-1453 at 2–3; JX-1566 at 1–11; JX-1579 at 3; JX-1619 at 3; JX-1703 at 1.

[261] Dkt. 38.

requested under Section 6.5 of the Merger Agreement.[262]  On January 16, Nano substituted counsel.[263]  On January 17, for the first time, Nano raised "concerns regarding Desktop's compliance with its covenants under Section 5.1 of the Merger Agreement."[264]  Ironically, weeks earlier on January 4, after Desktop posted a monthly cash burn of $100,000 in December, Nedivi sent a rare compliment to Desktop's Vice President of Finance and Treasury:  "Nice job."[265]

On January 19, Desktop moved for leave to file an amended complaint, which Nano opposed.[266]  The court granted the motion, and Desktop filed its Verified Amended Complaint on February 3.[267]

Nano filed its Answer to the Verified Amended Complaint and new Verified Counterclaims (the "Counterclaims") on February 4.[268]  Nano's Counterclaims contain two counts.  In Count I, Nano claims anticipatory breach of several sections

---

[262] On December 28, Nano sent a letter to Desktop demanding information under Section 6.5 of the Merger Agreement.  Among other things, Nano demanded "the basis for . . . Desktop's description of its financial condition in the Motion [to expedite] and the Complaint."  JX-1612 at 1.  Desktop provided information in response.  JX-1699; JX-1708.  Following the filing of Nano's initial counterclaim, Desktop provided Nano with additional information and issued a timely cure notice on February 2, 2025.  JX-1843.  Nano disputed Desktop's cure notice, JX-1850, and a letter writing campaign ensued.  *See, e.g.*, JX-3356.  By the time of trial, Nano's counterclaim to enforce the Buyer Information Rights was relegated to context and color.

[263] Dkt. 46.  The court entered the order granting the substitution on January 17.  Dkt. 47.

[264] JX-1774 at 1.

[265] JX-1688; Trial Tr. at 31:1–12 (Nogueira).

[266] Dkt. 48; Dkt. 72.

[267] Dkt. 101.

[268] Dkt. 106.

of the Merger Agreement.[269]   In Count II, Nano seeks a declaratory judgment that Desktop breached the Merger Agreement in numerous ways, thereby allowing Nano to terminate.[270]

### J.      Negotiations With CFIUS Continue.

As this litigation progressed, the parties continued to communicate with CFIUS concerning the NSA.  On February 1, CFIUS sent back a revised NSA.[271] CFIUS and the parties exchanged additional drafts on February 8 and 11.[272]  When sending the February 11 draft, CFIUS described it as the "final version" and requested signatures by February 14.[273]

The same day, Nano raised new concerns.  In a February 11 letter to CFIUS, Nano asserted that because certain products purchased by the government were made in Gersthofen, Germany, and the NSA would impose a five-year process if Desktop wished to move production of those products to a new non-approved facility, Nano would be unable to exercise the control it intended to over the entire Gersthofen plant.[274]  Up to that point, Nano had never discussed shuttering Gersthofen, and

---

[269] *See* Dkt. 106 at 74 ¶ 66 (alleging breach as to Section 3.6 (Desktop's representations and warranties), 5.1 (ordinary course covenant), 6.5 (Nano's information right provision), 6.6 (notice of changes that may constitute an MAE), 6.15 (regarding the Bridge Loan), and 7.2 (conditions precedent to closing) of the Merger Agreement).

[270] *Id.* ¶ 80.

[271] JX-1840.

[272] JX-1890; JX-1906.

[273] JX-1906.

[274] Trial Tr. at 208:18–24 (Lederman); JX-3284 at 22–24; JX-1972 at 1–3.

Nano's businesspeople had done no serious analysis to support its new litigation proposition.[275] Lederman claimed at trial that Nano was unable to raise this argument earlier because it lacked the requisite data, but it is hard to credit this testimony.[276]

Ignoring CFIUS's requested February 14 deadline for signatures, Nano waited until February 24 to comment on CFIUS's February 11 draft.[277] Because the parties missed the deadline, they had to request to withdraw their Joint Voluntary Notice and refile.[278]

On March 5, CFIUS sent the parties an updated draft that addressed most of Nano's comments and edits.[279] CFIUS also set a March 12 deadline for Nano to give substantive feedback on the draft.[280] On March 10, after CFIUS made what Nano categorized as "significant progress,"[281] and just weeks before the Merger Agreement end date, Nano sent CFIUS a new draft with new edits.[282] Substantively, Nano's

---

[275] Trial Tr. at 49:9–50:18 (Nogueira); *see also* Baharav Dep. Tr. at 221:8–222:22; Trial Tr. at 355:13–356:9 (Baharav).

[276] JX-3382; JX-3383; Trial Tr. at 376:22–379:15 (Cole).

[277] JX-1970.

[278] JX-3291.

[279] JX-4215 at 1.

[280] *Id.*

[281] JX-3375 at 2.

[282] JX-3379.

sticking points involved manufacturing-location, software, board-observer, and effectiveness provisions.[283]

None of Nano's efforts to negotiate an NSA in February and March were an effort to satisfy a closing condition. Nano made that clear on February 18, stating that it was no longer employing any efforts to reach closing unless and until it was ordered to do so by this court.[284]

## II. LEGAL ANALYSIS

Desktop claims that, in failing to obtain CFIUS approval, Nano breached its obligations to use reasonable best efforts to close the Merger as soon as reasonably possible and obtain CFIUS approval come hell or high water (together, the "CFIUS-Approval Claims"). In defense of the CFIUS-Approval Claims, Nano invokes the 10% Carveout and asserts illegality under Israeli law as an affirmative defense. Desktop disputes Nano's assertions of illegality and, in response to Nano's arguments under the 10% Carveout, relies on the Required-Actions Exception.

Nano counterclaims that Desktop violated the No-Bankruptcy Condition. Nano also claims that Desktop breached the Covenant-Compliance Condition by failing the Ordinary-Course Covenant, the Receivables/Payables Covenant and the Transaction-Expenses Covenant. Last, Nano claims that Desktop breached the Bridge-Loan Provision. Desktop argues that the No-Bankruptcy and Compliance-Covenant Conditions have occurred or that, alternatively, their nonoccurrence is

---

[283] *Id.* at 47, 63–66.

[284] JX-1954 at 1.

51

excused under the prevention doctrine because Nano contributed materially to the failure of the condition. Desktop also claims that it complied with its obligations under the Bridge-Loan Provision.

The standard of proof is straightforward. The party asserting breach bears the burden of proof and must meet that burden by a preponderance of the evidence.[285] Typically, a party seeking specific performance must meet its burden by clear and convincing evidence, but the parties altered this common-law approach by stipulating to specific performance in the Merger Agreement.[286] Desktop and Nano, therefore, must prove their claims of breach by a preponderance of the evidence.

The burden allocation is complicated. Under common law,[287] the party seeking to enforce the contract must prove each element of a breach of contract claim,[288] and a party asserting an affirmative defense bears the burden of proof.[289] Condition-laden contracts like merger agreements complicate the burden allocation.

---

[285] *See AB Stable VIII LLC v. Maps Hotels & Resorts One LLC*, 2020 WL 7024929, at *48–50 (Del. Ch. Nov. 30, 2020), *aff'd,* 268 A.3d 198 (Del. 2021) (footnotes omitted).

[286] *26 Cap. Acq. Corp. v. Tiger Resort Asia Ltd.*, 309 A.3d 434, 464 (Del. Ch. 2023); *Akorn, Inc. v. Fresenius Kabi AG*, 2018 WL 4719347, at *19 (Del. Ch. Oct. 1, 2018), *aff'd*, 198 A.3d 724 (Del. 2018) (ORDER).

[287] The parties could have addressed the burden of proof in the Merger Agreement but did not do so. This decision therefore applies common law principles to allocate the burden. *See AB Stable VIII LLC*, 2020 WL 7024929, at *5.

[288] *Shareholder Representative Servs. LLC v. Shire US Hldgs., Inc.*, 2020 WL 6018738, at *17 (Del. Ch. Oct. 12, 2020), *aff'd* 267 A.3d 370 (Del. 2021) (TABLE) (footnotes omitted) ("Contracts that contain conditions, however, require another layer of analysis when allocating the burden of proof.").

[289] *Lighthouse Behav. v. Milestone Addiction*, 2023 WL 3486671, at *9 (Del. Ch. May 17, 2023).

> In disputes over contractual conditions, the *Restatement (Second) of Contracts* instructs courts to look to the nature of the condition at issue. If a condition must be satisfied before a duty of performance arises (formerly known as a condition precedent), then the burden of proof rests with the party seeking to enforce the obligation. If a condition would extinguish a party's duty of performance (formerly known as a condition subsequent), then the burden of proof rests with the party seeking to avoid the obligation.[290]

Applying these principles to Desktop's claims for breach of contract, Desktop bears the burden of proving the CFIUS-Approval Claim to a degree—Desktop must show that Nano failed to use reasonable best efforts to close as soon as reasonably possible and failed to meet its obligations under the hell-or-high-water clause of Section 6.7(b). The burden then flips to Nano to prove that the NSA conditions fall within the 10% Carveout and to prove the affirmative defense of illegality. If Nano proves the 10% Carveout, then the burden returns to Desktop to prove that the Required-Actions Exception applies.

As to Nano's claims for breach of contract, Nano bears the burden of proving that the No-Bankruptcy and the Covenant-Compliance Conditions have failed. If Nano proves that the conditions have failed, then Desktop must prove that the nonoccurrence is excused under the prevention doctrine. Nano also bears the burden of proving that Desktop breached its obligations under the Bridge-Loan Provision.

### A.    Desktop's Claim

According to Desktop, Nano's obligation to close is subject to only Section 7.1(b)(iii) requiring CFIUS approval. Desktop claims that this is Nano's fault,

---

[290] *AB Stable VIII*, 2020 WL 7024929, at *49.

because Nano has breached its hell-or-high-water obligations of Section 6.7(b) of the Merger Agreement. Desktop also claims that Nano breached its obligations under Section 6.7(a) to use reasonable best efforts to close the Merger as soon as reasonably possible, and its obligations in the first sentence of Section 6.7(b) to use reasonable best efforts to secure regulatory approval. Because those arguments overlap factually with Desktop's arguments under Section 6.7(b), this analysis focuses on Section 6.7(b).

Formally titled "Actions in Connection with Required Regulatory Approvals," Section 6.7(b) is a single paragraph that (rather ominously) is 666 words long. That paragraph contains five sentences. The first and the third sentence are at issue. Reformatted with bracketed notations, these sentences state:

> **[1]** Without limiting the further requirements specifically set forth in this Section 6.7, each of the parties shall use its reasonable best efforts to resolve any objection that may be asserted by any Governmental Entity with respect to the Merger and the other transactions contemplated by this Agreement.
>
> . . .
>
> **[3]** Moreover, Parent shall, and shall cause its Affiliates to, take, or cause to be taken, all action necessary to receive CFIUS Approval so as to enable the Closing, including providing all such assurances as may be necessary requested or imposed by CFIUS, including, without limitation, entering into a mitigation agreement, letter of assurance, national security agreement, proxy agreement, trust agreement or other similar arrangement or agreement, in relation to the business and assets of the Company; **[10% Carveout]** provided, however, that, notwithstanding anything in this Agreement to the contrary, Parent shall not be required to consummate the transactions contemplated by this Agreement to the extent

54

any condition imposed in connection with the CFIUS Approval would effectively prohibit or limit the Parent Board from exercising control over any portion of the business of the Company and the Company Subsidiaries that, in the aggregate, constitutes more than ten percent (10%) of the Company's consolidated fiscal year 2023 revenue or 2024 year-to-date revenue (the "Affected Business") **[exceptions to the 10% Carveout]** (provided, however, that it is acknowledged and agreed that neither **[the Required-Actions Exception] (i)** the Remedies set forth in Section 6.7(b) of the Parent Disclosure Schedule, nor **[Board-Election Exception] (ii)** any condition imposed in connection with the CFIUS Approval with respect to a board of directors or other governing body that permits Parent to directly or indirectly elect a majority of the individuals to such board of directors or other governing body, shall be deemed to effectively prohibit or limit the Board of Directors of Parent from exercising control over the Affected Business) . . . .

The first sentence of Section 6.7(b) is a plain-Jane, bilateral "reasonable best efforts" covenant applied to regulatory approval generally, framed as "objection[s] that may be asserted by any Governmental Entity." Reasonable-best-efforts provisions have been interpreted to require each party to "take all reasonable steps to solve problems and consummate the transaction."[291] It also requires each party to take "appropriate actions to keep the deal on track," including but not limited to engaging in forthright discussions with the counterparty.[292] Good faith is relevant. A party cannot go "looking for a way out of its deal."[293]

---

[291] *Williams Cos. v. Energy Transfer*, 159 A.3d 264, 272 (Del. 2017).

[292] *In re Anthem-Cigna Merger Litig.*, 2020 WL 5106556, at *92 (Del. Ch. Aug. 31, 2020).

[293] *Id.*

The quoted portion of the third sentence of Section 6.7(b) applies to a specific kind of regulatory approval—CFIUS approval. It sets out the hell-or-high-water provision and subjects that provision to the 10% Carveout. The 10% Carveout in turn contains two carve-outs, which this decision will call "exceptions" to minimize confusion—the Required-Actions Exception and the Board-Election Exception. Of the two exceptions, only the Required-Actions Exception is at issue.

Generally, a hell-or-high-water provision attempts to clarify a reasonable-best-efforts provision by "expressly spell[ing] out what is or is not required" of a buyer.[294] Of the range of concessions to a reasonable-best-efforts provision that a seller may secure from a buyer, hell-or-high-water provisions are the most "extreme."[295] They are the strongest possible commitment a party can make in a merger agreement with request to regulatory approval.[296] They are, therefore, rare.[297]

Hell-or-high-water provisions often retain some degree of buyer flexibility in negotiating with the regulatory body.[298] Section 6.7(b) does so expressly through the 10% Carveout, which provides that Nano may object to conditions that would

---

[294] Lou R. Kling & Eileen T. Nugent, *Negotiated Acquisitions of Companies, Subsidiaries and Divisions* § 13.02 (2024 ed.).

[295] Am. Bar Ass'n, Model Public Merger Agreement 197 (2011).

[296] *Akorn*, 2018 WL 4719347, at *96 n.825.

[297] *See* Stephen Fraidin, Joel Mitnick, and Ross Steinberg, *Hell or High Water Provisions in Merger Agreements: A Practical Approach*, HLS Forum on Corporate Governance (May 25, 2022), https://perma.cc/DVP8–ZP79.

[298] Nano's expert opined that hell-or-high-water provisions are not intended to eliminate all buyer discretion, which would create an undesirable bargaining dynamic in negotiations with regulators. *See generally* JX-4214 (Solomon Rep't) ¶¶ 18–24.

"effectively prohibit or limit" its ability to "exercis[e] control over any portion of the business of the Company and the Company Subsidiaries that, in the aggregate, constitutes more than ten percent (10%) of the Company's consolidated fiscal year 2023 revenue or 2024 year-to-date revenue (the 'Affected Business')."[299]

The discretion afforded to Nano by the 10% Carveout is limited by the Required-Actions Exception, which sets out thirteen "Required Actions – Actions in Connection with Required Regulatory Approvals."[300]   If the action is among the "Required Actions" of Schedule 6.7(b), then Nano may not contend that it effectively prohibits Nano's ability to exercise control over an Affected Business.   Four of the thirteen are at issue:  Requirement 2, "establishing guidelines and terms for handling existing or future contracts with the U.S. Government or its contractors, U.S. Government customer information, and other sensitive information;" Requirement 3, "ensuring that only authorized persons have access to certain technology, systems, facilities, or sensitive information;" Requirement 8, "security protocols to ensure the integrity of products or software sold to the U.S. Government;" and Requirement 10, "assurances of continuity of supply to the U.S. Government for defined periods, notification and consultation prior to taking certain business decisions, and reservation of certain rights for the U.S. Government in the event that the company decides to exit a business line."[301]

---

[299] Merger Agr. § 6.7(b).

[300] *Id.* at 179, Parent Disclosure Schedule § 6.7(b).

[301] *Id.*

As discussed above, the parties share the burden of proof under Section 6.7(b). Desktop must prove that Nano breached the hell-or-high-water provision, Nano bears the burden of proving that the 10% Carveout applies, and Desktop bears the burden of proving that the Required-Actions Exception applies.

### 1. Nano's Efforts Come Hell Or High Water

The initial question presented by Section 6.7(b) is whether Nano took "all action necessary to receive CFIUS Approval so as to enable the Closing," including those actions listed in Section 6.7(b). Nano faces an uphill battle in convincing anyone that it did everything it could, come hell or high water, to obtain Desktop approval after Murchinson took over the Nano board. Having won their positions on Murchinson's promise to scuttle the Desktop deal, the Murchinson-nominated board members seemed intent on making good on that promise by obstructing CFIUS approval.

The facts are stark. Murchinson ardently opposed the Desktop acquisition, it vowed to take all efforts to unwind the agreement, and it called to stop the deal long after the Merger Agreement was signed. Murchinson said this repeatedly and

publicly in no uncertain terms.[302]  The self-described "team"[303] of Murchinson's board nominees, who comprised the entire Nano board as of December 6, 2024, were aligned with the mission[304] to "[s]uspend . . . the deal."[305]  And they identified regulatory approval, and specifically CFIUS approval, as a means to this end.[306]

It is no wonder that, after Murchinson took over the Nano board on December 16, Nano stopped attempting to obtain CFIUS approval and started obstructing it.

The timeline is damning.  The parties received their first draft of the NSA on November 22.  Two days after CFIUS sent the first draft of the NSA, Desktop

---

[302] *See, e.g.*, JX-439 at 2 (3/11/24 email from Sarfaty to Fulop stating that Murchinson had "every intention to challenge any such improper deal"); JX-3317 at 1–2 (6/28/24 letter from Murchinson to Nano stockholders stating that Murchinson would "consider all options for unwinding" the Desktop merger); JX-1085 at 2 (10/28/24 press release from Murchinson citing the "overpriced, misguided acquisition[] of Desktop" as a basis for proxy contest); JX-1163 at 19 (11/10/24 presentation to ISS stating there was "Urgency" to stop Nano's "plans to spend over $400 million acquiring" Desktop).

[303] *See, e.g.*, JX-1397.

[304] *See, e.g.*, JX-1322 (12/2/24 email between Baharav and Sarfaty about board meeting and "our" agenda).

[305] JX-1402 (12/9/24 email among Murchinson board members); JX-1128 at 4 (11/26/24 private message from Baharav to Pons including "[s]uspension of deals" among "Board actions to restore investors confidence").

[306] *See, e.g.*, JX-1116 (11/1/24 email from Baharav to Janjua asking "where is nano in the process of the acquisitions when is the closing when is the sec, ftc, doj"); JX-3364 (11/10/24 slide deck developed by Baharav titled "Reckless & Astronomical Valuations . . . for DM"); JX-3035 at 51 (11/6/24 internal Murchinson presentation alleging that two of Nano's legacy board members had ongoing business connections with Russian oligarch); JX-1148 (11/7/24 article repeating allegations of Nano ties to Russian oligarch found in 11/6/24 Murchinson internal memo); JX-1170 at 57 (11/12/24 Murchinson press release asserting that CFIUS review "create[s] significant risk that additional information damaging to Nano's value will come to light").

informed Nano that it was prepared to accept it "as is."  Nano shared its redline with CFIUS on December 4.  CFIUS responded on December 10, inviting discussion as to certain modifications.  By then, however, Murchinson had taken over the Nano board.  Rather than use reasonable best efforts to obtain CFIUS approval and consummate the Merger "as soon as reasonably possible,"[307] Nano went radio silent on the NSA for 38 days.  After making incremental changes in February, CFIUS sent its February 11 draft requesting signatures by February 14.[308]  Nano waited until February 24 to comment.  By then, the parties had withdrawn the notice, so CFIUS could not have accepted Nano's draft within the statutory period.

Nano's negotiation positions also tell the tale.  As a reminder, the exchange of drafts went like this:  CFIUS sent the first NSA draft to the parties on November 22.[309]  Nano responded on December 4.[310]  CFIUS sent back comments on December 10.[311]  Nano responded on January 17.[312]  CFIUS sent an updated draft on February 1, the parties sent a further revised version on February 8, and then CFIUS sent a final draft on February 11, asking for signatures by February 14.[313]  Nano instead sent further comments on February 24.[314]  CFIUS responded with a redline on March

[307] Merger Agr. § 6.7(a).

[308] JX-1906.

[309] JX-1239.

[310] JX-1362.

[311] JX-1412.

[312] JX-1768.

[313] JX-1902.

[314] JX-1972.

5, setting a March 12 deadline to respond.[315]   On March 10, Nano responded, rescinding portions of its February 24 proposals.[316]

At trial, Nano cites four terms of the March 5 draft to justify its refusal to sign the NSA:  restrictions on manufacturing locations for products supplied to the U.S. Government (the "manufacturing-location provision"); limitations on the use of certain remote access software (the "software provision"); a non-voting board observer provision (the "board-observer provision"); and the date on which the NSA obligations take effect (the "effective date provision").

The CFIUS Committee's November 22 draft contained a suite of mitigation measures, including all four of the terms Nano now invokes to justify its refusal to sign.  In the December 4 redline, Nano did not object to the manufacturing-location, software, board-observer, or effective date provisions.[317]   Nano accepted these provisions in principle, requesting targeted modifications only.[318]   Indeed, Nano used the board-observer provision as a reason to strike CFIUS's proposed third-party monitor provision.[319]   Momentarily setting aside the question of whether these four provisions implicate the 10% Carveout or Required-Actions Exception, Nano's negotiation positions were not consistent with a party taking all actions necessary to obtain CFIUS approval.

---

[315] JX-3314.

[316] JX-3379.

[317] JX-1362 at 18–19, 20, 24–28, 43.

[318] *Id.*

[319] *Id.* at 36

The December 4 draft that Nano sent to CFIUS included two changes to the four provisions that Nano challenges. First, Nano sought to replace the reference to "Transaction Parties" with the "Combined Company" to "refer to th[e] integrated operations in the United States" as "post-closing Nano intend[ed] to integrate the operations of Nano and [Desktop] in the United States."[320] Second, Nano sought to limit attendance of the board observer to Board meetings relating to U.S. Government customers, the Covered Products or Covered Services, or the NSA.[321] CFIUS rejected both edits but offered to discuss.[322]

The January 17 draft that Nano finally sent was a stark contrast to the December 4 draft Nano had been ready to accept. Nano struck the manufacturing-location and board-observer provisions entirely and made substantive revisions to the software restrictions including striking portions of it.[323] This was a drastic change, particularly in light of Nano's prior position relying on the board-observer provision as a reason to strike the third-party monitor provision.

The drafts exchanged on February 1, 8, and 11 incrementally moved the ball forward, but Nano moved the goalposts—again—in its February 24 draft.

On the manufacturing-location provision, Nano did not edit the language but included a comment box stating that it continued to be a key concern.[324] CFIUS

---

[320] JX-1362 at 14.

[321] *Id.* at 26–27.

[322] JX-1412 at 18.

[323] JX-1770 at 50–51, 56–60.

[324] JX-1970 at 9.

responded with a proposed compromise, which Nano rejected by reverting back to the language it proposed on February 8 that CFIUS had already rejected.[325]

On the software provision, CFIUS indicated the importance of keeping such protections given "the national security risk arising in this transaction."[326] But Nano rejected CFIUS's proposed language, stating that it was inconsistent with other portions of the NSA.[327] CFIUS then proposed language intended to address Nano's concerns while mitigating the national security risk.[328] Again, unproductively, Nano struck the provision entirely in its March 10 draft.[329]

After Nano had deleted it, CFIUS reinserted the board-observer provision, incorporating language to address Nano's concern that the board observer would not be performing the duties of a director and welcoming further discussion on the topic.[330] Again on February 24, Nano did not edit the language but included a comment box that it "continue[d] to have concerns regarding having a board observer on Nano's board."[331] In its March 5 draft, CFIUS requested that the parties provide a legal analysis or legal opinion regarding the potential conflict between the board-

---

[325] JX-3379 at 24.

[326] JX-JX-1906 at 18.

[327] JX-1970 at 8.

[328] JX-3314 at 22.

[329] JX-3379 at 23.

[330] JX-1906 at 23.

[331] JX-1970 at 13.

observer provision and Israeli law.[332]  It was not until March 10 that Nano provided CFIUS with the requested expert report—the one prepared for this action.[333]

Nano did not touch the effective date provision until the March 10 draft, when it stated for the first time its position that the parties' obligations under the NSA should apply as of the Closing Date.[334]

Nano's conduct after December 6 does not evidence a party taking all actions necessary to obtain CFIUS approval—just the opposite.  Desktop has proven that the Murchinson board nominees intended to use CFIUS approval to scuttle the deal and attempted to obstruct CFIUS approval through a pattern of delay and backtracking.

### 2.    10% Carveout

The 10% Carveout covers conditions to CFIUS Approval that "would effectively prohibit or limit the [Nano] Board from exercising control over any portion" of Desktop that "in the aggregate, constitutes more than ten percent (10%) of the Company's consolidated fiscal year 2023 revenue or 2024 year-to-date revenue[.]"[335]

Desktop offers a narrow interpretation of the 10% Carveout.  The Merger Agreement defined "control" as "the possession, directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of voting securities, contract or otherwise."[336]  Desktop observes that this definition of

---

[332] JX-3314 at 27.

[333] JX-3379 at 28.

[334] *Id.* at 47.

[335] Merger Agr. § 6.7(b).

[336] *Id.* at 56.

"control" mirrors SEC Rule 405, which provides definitions for terms used in the Securities Act of 1933.[337] The relevant inquiry under Rule 405 is whether a purported "control" person effectively wields managerial authority over the entity at issue.[338] The use of this definition suggests that the 10% Carveout is concerned only with situations where CFIUS wrests managerial authority away from Nano and vests it in some other "control" person or persons, such as a board run by U.S. government appointees.

Nano made statements consistent with Desktop's interpretation when negotiating the 10% Carveout, explaining that the exception was meant to address a "narrow set of circumstances," where CFIUS requires "a subsidiary board that does not answer to the Parent Board but rather is self governing[.]"[339]

Under this narrow interpretation, the March 5 NSA does not implicate the 10% Carveout because it does not empower any person or entity to control Desktop or a subsidiary. The NSA provisions to which Nano objects do not create any independent governance structure or prevent Nano from directing any "portion of Desktop's

---

[337] 17 C.F.R. § 230.405 (defining "control" as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise").

[338] *See, e.g.*, *Waterford Inv. v. Bosco*, 682 F.3d 348, 354 (4th Cir. 2012) (applying Rule 405's definition of "control" to FINRA Rule 12200 to assess whether a FINRA "member" exercised "control" over its associate); *SEC v. Kern*, 425 F.3d 143, 149 (2d Cir. 2005) (applying Rule 405 to determine whether Seller constituted an "'affiliate' of an issuer" based on its control of the issuers).

[339] JX-647 at 117; JX-3204 at 1.

business." Nano would retain authority to appoint Desktop's management, set its strategy, and allocate capital.

In this litigation, Nano rejects this narrow interpretation and offers a broad one in its place. Nano relies on the words "effectively," "limit," and "control." The Merger Agreement defines "control" but does not define "effectively" or "limit." Nano relies on dictionary definitions that define "effectively" as "achieving the same result" and "limit" as a "restriction or restraint."[340] Putting it together, Nano argues that the 10% Carveout broadly covers any provision that has the effect or achieves the result of limiting Nano's ability, directly or indirectly, "to direct the management and policies of" Desktop.

Nano bolsters this interpretation with aspects of the drafting history. In negotiations, Desktop sought to add "materially" before "limit," explaining that absent such a qualifier "any condition could be construed as limiting [Nano's] ability to exercise control[.]"[341] After Nano resisted including a further materiality qualifier beyond the 10% threshold, Desktop accepted this deletion and instead identified in the Parent Disclosure Schedule particular items that would be carved out from the 10% Provision.[342] The parties' understanding of control thus was limited only by the

---

[340] *Effectively, Limit, Control*, Black's Law Dictionary (12th ed. 2024); *see also Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 738 (Del. 2006) ("Delaware courts look to dictionaries for assistance in determining the plain meaning of terms[.]").

[341] JX-626 at 45.

[342] JX-647 at 117 (6/27/24 email from Nano's counsel to their client attaching the draft merger agreement they sent across to Desktop's counsel, in which they describe the "actions that limit the Parent Board's control over a percentage of the business

66

10% showing and the Parent Disclosure Schedule, without any consideration of materiality beyond the 10% threshold.

Even accepting broad Nano's broad interpretation of the 10% Carveout, it is difficult to conclude that the NSA software or manufacturing-location provisions meet the 10% threshold, and Nano does not argue that the board-observer or effective date provisions do so.

The software provisions do not implicate the 10% threshold. Nano admits that the software restrictions directly affect far less than 10% of Desktop's business by revenue. Lederman testified the post-merger entity could use compliant software in the Covered Products sold to the U.S. government, which account for less than 2% of Desktop's revenue, while doing whatever it wants with software in other units of the Covered Products sold to other customers.[343]

Lederman's concern with the software provisions was that implementing it would not be "fair[] and effectiv[e]."[344] Nedivi likewise testified that adhering to the software restrictions is "probably achievable, but it doesn't make sense to do" simply because it would be "problematic" from a "business perspective."[345] The Merger Agreement, of course, contains no exception to the hell-or-high-water provision for

---

exceeding 10%" as "a narrow set of circumstances"); JX-680 at 9 (6/29/24 email from Desktop's counsel with a proposed "list of remedies that would be deemed not to limit [Nano's] control").

[343] Trial Tr. at 158:21–159:11 (Lederman).

[344] *Id.* at 159:10 (Lederman).

[345] *Id.* at 429:7–21 (Nedivi).

NSA terms that could be "problematic" from a "business perspective" or things that Nano view as "unfair."

Nano argues that the provision "effectively" "limits" its control over revenue exceeding the 10% threshold. Lederman testified that the software provision "effectively" prohibits Nano from exercising control over a "hundred percent" of Desktop's S-Max business.[346] On further examination, however, Lederman's testimony boils down to the idea that the 10% exception is tripped by any restriction that might "affect" unspecified "synergies" that Nano theoretically may seek to realize.[347] That is not how the agreement reads. If it were, then virtually any provision appearing in any NSA would fall within the 10% Carveout.

In sum, the software-restrictions provision in the March 5 NSA does not implicate the 10% Carveout because it does not meet the 10% threshold.

The manufacturing-location provisions do not implicate the 10% threshold directly. The March 5 NSA draft would require Nano to provide 180 days' notice before relocating manufacturing for U.S. government products to any facility not currently in Desktop's portfolio.[348] CFIUS can in its discretion prohibit any such relocation for five years, and afterward compel Nano to license its software indefinitely to a third party.[349] This is no doubt a limitation on Nano's right to

---

[346] *Id.* at 143:20–144:15 (Lederman).

[347] *Id.* at 187:5–17 (Lederman).

[348] JX-4215 at 30.

[349] *Id.* at 32; Mosman Dep. Tr. at 217:8–219:6.

manage its costs and consolidate its manufacturing. But the manufacturing location restriction only applies to "Covered Products," defined as products sold to U.S. Government customers.[350] U.S. Government customers accounted for 4% of Desktop's revenues in 2023, and 1.9% of Desktop's revenues in the first half of 2024. This is less than the 10% threshold.

Tacitly conceding the force of this point, Nano again responds that the manufacturing-location provision indirectly or "effectively" "limits" its control over more than 10% of the relevant aggregate revenue. Nano witnesses testified that the freedom to consolidate manufacturing sites strikes at "the heart of" Nano's cost-reduction strategy.[351] To be a viable competitor in the additive manufacturing space, Nano desires the freedom to move manufacturing to lower-cost geographical regions.[352] They say that it would be cost prohibitive and wasteful to manufacture just products sold to the U.S. government in existing facilities while moving the same products sold to other customers to more cost-effective locations. Doing so would require the creation of a complex manufacturing requirement just for the U.S. government, which could preempt other investments.[353]

---

[350] JX-4215 at 20 (defining "Covered Products" as "any products produced by Desktop . . . that have been provided to USG Customers in connection with any USG Customer contracts or purchase orders in the twenty-four (24) months prior to the Effective Date . . . *to the extent provided to USG Customers*"). Nano sought and obtained the clarification in the italicized letters. JX-3314 at 17.

[351] Trial Tr. at 133:19–24, 137:23–138:7, 138:17–139:4, 142:20–24 (Lederman); *id.* at 251:11–21 (Baharav).

[352] *Id.* at 251:11–252:13 (Baharav); *id.* at 432:15–433:17 (Nedivi).

[353] *Id.* at 258:11–260:16 (Baharav).

Nano illustrates its point by reference to the Gersthofen facility, which manufactures Desktop's S-Max Pro printer and is up for lease renewal in 2027.[354] Nano says that if the U.S. Government buys two of 20 S-Max Pro printers manufactured at Gersthofen annually, it would be commercially untenable to have two such facilities or allow two products to dictate where the remaining 18 are made.[355] Accordingly, CFIUS's proposed restriction on manufacturing locations limits, at the least, Nano's control over all versions of products that are sold to the U.S. government, regardless of customer (which are well over 10% of Desktop's business[356]), and potentially nearly all of Desktop's business.[357]

Nano's "effectively limit" argument is not totally spurious if one accepts Nano's broad interpretation of the 10% Carveout. This argument does, however, seem made-for-litigation given the evidence presented at trial. Nano raised the issue of moving production out of Gersthofen for the first time in its February 24 letter to CFIUS.[358] Nano had no plans to consolidate the Gersthofen facility during the robust PMI process.

Indeed, the opposite was true—Nano planned to consolidate manufacturing *into* Gersthofen. Just days before the parties initiated the CFIUS review process,

---

[354] JX-1982 at 14–16.

[355] Trial Tr. at 142:20–144:15, 153:22–154:11, 141:8–12, 146:7–17 (Lederman); *see also id.* at 253:24–254:17 (Baharav).

[356] *Id.* at 135:15–136:23, 143:20–144:15 (Lederman).

[357] *Id.* at 258:11–260:16 (Baharav).

[358] *Id.*

70

PwC prepared an integration presentation for Nano emphasizing that Gersthofen is a "core business" that is "recommended to stay."[359] That presentation identified no fewer than 13 manufacturing facilities for potential closure or downsizing, including four in Germany.[360] For Gersthofen, PwC recommended a broader strategy of "consolidation into Gersthofen,"[361] touting the resulting $1.1 million in savings as a "Quick Win" Nano could achieve within "Day 1-100."[362] Nano's leadership agreed,[363] and that remained the plan.[364] Until Nano decided it served its interests in this litigation to claim otherwise, there was no indication it ever considered any approach other than "[c]ontinu[ing] to run Gersthofen profitably."[365] As Nogueira, who led Desktop's PMI efforts testified, "the game plan in the playbook was to consolidate those other facilities into Gersthofen, including Nano's Munich facility."[366]

Nano presented no credible testimony to the contrary. During depositions, Nano relied on the testimony of its former Chief Revenue Officer Baker. But when confronted at his deposition with the many documents establishing Nano's intention to consolidate into Gersthofen, Baker conceded that he "was not involved in the

---

[359] JX-1622 at 27–28.

[360] *Id.*

[361] *Id.*

[362] *Id.* at 28, 31.

[363] JX-3208 at 1.

[364] JX-3202 at 2.

[365] JX-1622 at 195.

[366] Trial Tr. at 49:7–50:18 (Nogueira).

71

facility consolidation planning."[367]  Baker admitted he was not "aware of any discussions about closing the Gersthofen facility."[368]  During trial, Baharav invoked the expiration of the Gersthofen lease as justification for seeking to close that facility.[369]  But he admitted on cross-examination that he was "surprised" to learn Desktop has a five-year extension option—information he claimed he "wasn't told []" when [he] asked."[370]

In sum, Nano's 10% Carveout based on the manufacturing-location provision only works if one accepts Nano's broad interpretation of the language and ignores Nano's revisionist history concerning the Gersthofen facility.  Otherwise, it fails. For the sake of argument, however, this decision assumes that Nano met its burden as to the 10% Carveout and turns to the Required-Actions Exceptions issue, discussed next.

### 3.    Required-Actions Exceptions

Even if the manufacturing-location or software provisions fall within the 10% Carveout, both also fall within four of the Required-Actions Exceptions.

The manufacturing-location and software provisions fall under Required Action 2, because they are "guidelines and terms for handling existing or future contracts with the U.S. Government."[371]  They are all defined by reference to the

---

[367] Baker Dep. Tr. at 142:5–9.

[368] *Id.* at 154:13–16.

[369] Trial Tr. at 253:16–254:17 (Baharav).

[370] *Id.* at 355:13–356:12 (Baharav).

[371] Merger Agr. at 179, Parent Disclosure Schedule § 6.7(b)(2).

Covered Products.[372] There is thus no requirement in any of these provisions that governs anything *other* than "existing or future contracts with the U.S. Government."[373] By seeking to dictate the manner in which those contracts are performed, including by specifying the location at which the Covered Products are made, the NSA sets forth "guidelines and terms for handling" such contracts.[374]

The manufacturing-location provisions also fall under Required Action 10, which covers "assurances of continuity of supply to the U.S. government" for defined periods.[375] The title of Article II.A, which requires Nano to "*continue to supply . . .* Covered Products . . . to existing USG Customers from the Manufacturing Locations," is "Supply Assurance."[376] The supply obligation is not indefinite, but rather lasts only "for [a] defined period[,]" as Required Action 10 requires.[377] The duties appearing in Article II.A are "[s]ubject to . . . Article III,"[378] which sets forth a detailed notice process for a range of actions related to "Covered Products and Covered Services,"[379] including the manufacturing-location provisions to which Nano objects. In rejecting

---

[372] JX-3314 at 22–23.

[373] Merger Agr. at 179, Parent Disclosure Schedule § 6.7(b)(2).

[374] *Id.*

[375] *Id.* § 6.7(b)(10).

[376] JX-4215 at 26.

[377] Merger Agr. at 179, Parent Disclosure Schedule § 6.7(b)(10).

[378] JX-4215 at 26.

[379] *Id.* at 30, Article III.B.1–3 (requiring notice before "ceasing or reducing the supply of Covered Products and Covered Services to USG Customers," "ceasing or reducing Production Capability," or "relocating the production of Covered Products to a location not listed on Annex A").

Nano's attempt to add a three-year limiter to Article II.A, CFIUS explained that "[w]e reject this edit, as *there's a time requirement* following the parties providing notice in Article III."[380]

The software restrictions fall under Required Action 8, which covers "security protocols to ensure the *integrity of products* or software sold to the U.S. Government."[381] The software provisions appear in a section of the NSA that is entitled "Product Integrity," and their declared purpose is to ensure the integrity of products or software sold to the U.S. Government.[382]

The software restrictions similarly fall under Required Action 3, which covers actions intended to "ensur[e] that only authorized persons have access to certain . . . sensitive information."[383]

Desktop has proven that the aspects of the March 5 NSA on which Nano bases its argument for the 10% Carveout are Required-Actions Exceptions.

### 4. Illegality/Israeli Law

In each NSA draft, CFIUS has included a provision requiring that Nano "appoint and maintain one observer" on Nano's Board, who would be required to be "present physically or virtually at all Board meetings" to report any NSA violations and to "prioritize the national security of the United States over any other

---

[380] JX-1838 at 7.

[381] Merger Agr. at 179, Parent Disclosure Schedule § 6.7(b)(8).

[382] JX-4215 at 28, Article II.C-D.

[383] Merger Agr. at 179, Parent Disclosure Schedule § 6.7(b)(3).

interest[.]"[384] Nano claims that this requirement is exceedingly uncommon and "likely"[385] conflicts with Israeli law.

This point seems irrelevant, because the Merger Agreement permits refusal to close on the basis of "illegality" only if an actual "legal restraint" directly prevents consummation.[386] In all events, Nano did not prove this point.

Nano offered the expert report of Professor Assaf Hamdani, a highly qualified and esteemed scholar of Israeli corporate law. Among other issues, Professor Hamdani opined that the board-observer provisions would call for the appointment of what is, in essence, a "de facto" or "shadow" director, who will owe fiduciary obligations to Nano.[387] Professor Hamdani argued that this is inconsistent with a provision requiring that the observer prioritize the national security interest of the United States over other interests and in violation of Section 106(b) of the Israeli Companies Law ("ICL").[388]

Desktop's equally esteemed expert, Professor Kobi Kastiel, explained that the ICL is silent on observers, and in the absence of a restriction, Israeli law is permissive, not restrictive. He further notes that "there has been a long-standing

---

[384] JX-1906 at 25.

[385] Dkt. 269 ("Nano Post-Trial Opening Br.") at 85.

[386] *See generally Anthem-Cigna*, 2020 WL 5106556, at *2 (construing similar provision narrowly); *AB Stable VIII LLC v. Maps Hotels & Resorts One LLC*, 2020 WL 7024929, at *80 (Del. Ch. Nov. 30, 2020) (same).

[387] JX-1975 at 10, 15–16 (Hamdani Rep't).

[388] *See* JX-1975. This above text is an oversimplification of Professor Hamdani's carefully crafted report.

practice of appointing observers in various contexts, both in public and private Israeli companies."[389]  And both the Israeli court and Israeli government have appointed observers on Israeli boards.[390]  In fact, the Israeli court had appointed observers to the Nano board in the Murchinson litigation.[391]

Professor Kastiel's opinion, coupled with the recent decision by the Israeli court in the Murchinson litigation on this very issue, defeats Nano's effort to prove by the preponderance of the evidence this nuanced issue of Israeli law.

### 5.     Conclusions On Desktop's Claims

Desktop proved that Nano breached its obligations under the hell-or-high-water provision.  And even if Nano carried its burden on aspects of its 10% Carveout arguments on either the manufacturing-location or software provisions, Desktop proved that the NSA terms to which Nano objects easily fall within the Required-Actions Exceptions.  Moreover, Nano has not proven its affirmative defense of illegality based on the board-observer provision.  Because Nano's primary offense relevant to CFIUS approval was delay, Nano also breached its obligation to use reasonable best efforts to close the Merger as soon as reasonably possible.  Desktop, therefore, has proven its CFIUS-Approval Claim.

---

[389] JX-1948 at 9 (Kastiel Rep't).

[390] *Id.* ¶ 25.

[391] JX-286 at 9 (holding that "one cannot accept [Nano's] position according to which taking an active part in board of directors' meetings by one who is not a director turns that person into a de facto director or shadow director. Those who are not directors frequently take an active part in board of directors' meetings and this does not turn them into de facto directors as argued by the Company").

### B. Nano's Claims

Nano's claims against Desktop fall into three categories.

First, Nano claims that Desktop breached the No-Bankruptcy Condition, triggered if Desktop "admits in writing its inability to pay its debts as they mature."[392]

Second, Nano claims that Desktop breached the Covenant-Compliance Condition, which conditions closing on Desktop having "performed or complied in all material respects with the obligations and covenants required to be performed or complied with by it under this Agreement at or prior to the Closing Date[.]"[393] Nano need not close the Merger unless Desktop has complied with this covenant (and others) "in all material respects."[394] Nano relies on the Ordinary-Course Covenant, the Receivables/Payables Covenant, and the Transaction-Expenses Covenant.

Third, Nano claims that Desktop breached the Bridge-Loan Requirement by failing to negotiate with Nano in good faith to execute definitive documentation for the Bridge Loan.

#### 1. No-Bankruptcy Condition

Under the No-Bankruptcy Condition, Nano is not obligated to consummate the Merger and may terminate the Merger Agreement if Desktop experiences a Bankruptcy.[395] In relevant part, the Merger Agreement defines Bankruptcy as

---

[392] Merger Agr, § 8.1(g)(ii).

[393] *Id.* § 7.2(b).

[394] *Id.* § 7.2(b).

[395] *Id.* §§ 7.2(b), 8.1(d)(ii).

occurring if Desktop "admits in writing its inability to pay its debts as they mature[.]"[396]

The language of the Merger Agreement is quite specific. The definition of "Bankruptcy" does not include insolvency. And Nano expressly agreed to exclude a solvency representation from the Merger Agreement.[397] To show the absence of the No-Bankruptcy Condition, Nano must prove by a preponderance of the evidence that Desktop (i) admitted, (ii) in writing, that it was (iii) unable, (iv) to pay its debts as they matured. Under the plain language of the No-Bankruptcy Condition, it is not enough that Desktop was insolvent. Nor is it enough that Desktop did not pay debts as they matured. Rather, Desktop must suffer an inability to pay its debts as they mature and then admit this much in writing.

To show that Desktop failed the No-Bankruptcy Condition, Nano introduces expert testimony from Jeffrey W. Kopa, a Partner and Managing Director at AlixPartners.[398] Kopa opined that "Desktop Metal either is not able to pay its debts as they come due or is likely to become unable to pay its debts as they come due in the very near-term."[399] "[L]ikely to become unable to pay debts as they come due in

---

[396] *Id*. § 8.1(d)(ii).

[397] *See* JX-946 at 79 ("While this term [a requirement that Desktop be solvent as a condition to closing] may have been removed from the Merger Agreement, Nano . . . requires this condition to be satisfied for all term loan borrowings."); JX-596 at 6 ("[r]emoval of solvency representation" is "[a]greed subject to agreement on operation of business covenant and loan term sheet").

[398] JX-1943 (Kopa Rep't) ¶ 5; *see also* JX-4217 (Kopa Supp. Rep't).

[399] JX-1943 ¶ 21(3).

the very near-term" does not run afoul of the No-Bankruptcy Condition. In a supplemental report, Kopa added that Desktop's past-due debts exceed its available cash, which comes closer to the hitting standard.[400] Kopa bases his opinions on Desktop's: public statements regarding bankruptcy, internal projections, communications with vendors, internal statements, and predictions concerning its cash position.[401] Kopa is highly qualified and was a credible and helpful witness. But a careful examination of his source materials reflects that they fall short of demonstrating the specific standard imposed by the No-Bankruptcy Condition.

Desktop's public statements regarding bankruptcy have been forward-looking statements, not admissions of a current inability to pay debts as they mature. In its Q2 and Q3 2024 SEC filings, Desktop states that "it is probable that the entity will be unable to meet its obligations as they become due within one year"[402] and litigation representations that Desktop was "depleting cash reserves with no financing backstop" and would "need additional financing in early 2025 to sustain operations."[403]

Desktop's public statements are consistent with Desktop's internal projections, which indicated that Desktop had "less than five months of remaining liquidity."[404]

---

[400] JX-4217 ¶ 10.

[401] JX-1943 ¶ 75. Kopa also references debt trading levels in his list of sources but does not discuss these in his analysis. He cites to historical cash burn rates as well, which supplies a basis for Desktop's cash projections discussed below.

[402] *Id.* ¶ 76.

[403] *Id.* ¶ 77.

[404] *Id.* ¶ 78.

Again, these projections are (by nature) forward looking. They do not show a current inability to pay debts as they mature.

The email exchanges to which Nano points regarding Desktop's overdue payments get closer to the mark, because they constitute written statements concerning Desktop's then-current cash situation.[405] But these communications do not amount to a written admission of the kind required to trip the No-Bankruptcy Condition. The emails cited by Nano contain one or more of the following from Desktop's vendors: (i) requests for payment; (ii) threats of legal action for collection of overdue payments (or notice that such legal action was already underway); and (iii) notices that a vendor would or already had determined to discontinue services due to non-payment. [406]

---

[405] *Id*. ¶¶ 80–84 (citing email exchanges); JX-4217 ¶¶ 2–11 (same).

[406] JX-1003 (10/1/24 text message exchange between Desktop employees regarding a "credit card declined" for "IMTS booth expense"); JX-4144 (10/30/24 email from vendor ICT regarding outstanding balances, stating that "$351,594 . . . is past due" and that "there is $23,580 that is very old and needs to be paid"); JX-1227 (11/20/24 emails between Desktop and Align Tech regarding outstanding invoices); JX-1267 (11/25/24 email from vendor Jabil attaching proposed forbearance agreement, which Desktop did not execute "on advice of counsel" per JX-4086); JX-1335 (12/2/24 internal Desktop email exchange regarding one vendor "threatening legal action" and others "looking for payment"); JX-4034 (12/5/24 email from vendor Omni regarding past due invoices); JX-4035 (12/9/24 internal Desktop email exchange regarding strategy to pay smaller outstanding accounts payable to "clear out some volume"); JX-4038 (12/10/24 email exchange regarding renegotiated payment terms with vendor CreoDent); JX-4037 (12/10/24 email from vendor Dennemeyer regarding outstanding balance and advising that the issue is raised with vendor's legal department); JX-4041 (12/10/24 email from FedEx regarding past due invoices); JX-1714 (12/18/24 letter from vendor Shapeways's Chapter 7 trustee regarding second demand for payment); JX-4083 (1/10/25 email exchange with vendor Apps Associates regarding outstanding balances and delayed payment); JX-4099 (1/14/25 text exchange regarding outstanding vendor payments to Founders); JX-1767 (1/16/25

80

The majority of these communications are from vendors to Desktop, and thus, by definition, do not constitute written admissions by Desktop. In a few of the communications, Desktop discusses its plans for payments to certain vendors, but those communications evidence an intent to pay, not an admission that Desktop could not pay.[407] Some of the communications even establish that vendors agreed to revised payment terms, suggesting that these exchanges are essentially negotiations.[408]

For Nano's purposes, the most helpful of these emails is a collection of exchanges that Desktop had with its "top vendor for 2023 and 2024 spend," Jabil Inc., one of the company's contract manufacturing partners.[409] In late November, Jabil sent Desktop a proposed forbearance agreement, providing that Jabil would not take

email from vendor Broadridge regarding past due invoices); JX-4062 (1/17/25 email exchange with vendor Brody Group regarding outstanding balances and threatened legal action); JX-4120 (1/27/25 email from vendor Omni regarding outstanding balances and informing of escalation to legal department); JX-4124 (1/28/25 email requesting payment information for outstanding invoices from vendor BostonBean); JX-4137 (2/3/25 email from vendor Steffan stating it would suspend service for non-payment and commenting on Desktop's strategy of paying a few smaller balance invoices but leaving larger balances outstanding).

[407] JX-1003 (explaining that a payment that Desktop made on an employee credit card was declined because her card limit was $5,000 and resolving to "send [the invoice] to AP [so] it can be in the normal process"); JX-1227 (explaining that Desktop intended to make a past-due payment by the end of the week or early the following week); JX-4035 (discussing a plan to prioritize smaller invoices over larger ones in the near term); JX-4099 (discussing a plan to check on a payment that was "hung up" because it was not "approved to pay").

[408] JX-4083 (vendor confirming it had received a payment the week of 1/6/25 and agreeing to move forward with renegotiated payment terms and deadlines); JX-4062 (confirming Desktop paid an overdue invoice on 1/17/25 and prevented a vendor from initiating threatened legal action).

[409] Trial Tr. at 95:5–11 (Nogueira).

legal action regarding Desktop's outstanding unpaid invoices if Desktop agreed to participate in a payment plan.[410] Weeks later, on January 10, 2025, Desktop responded that it could not enter the proposed forbearance agreement "upon legal advice from" its counsel because doing so would "be in conflict with" the Merger Agreement.[411] This does not look great for Desktop, but it also does not constitute the requisite written admission.

To be sure, this exchange and the vendor emails generally paint a pretty bleak picture of Desktop's financial position at the time. It seems clear that as 2024 was closing out, Desktop was struggling to stay on top of its bills. The Jabil emails further suggest that Desktop was acutely aware of and carefully avoiding making any representations that could be interpreted as admissions that the company could not pay its maturing debts. But the vendor exchanges nevertheless fall short of tripping the No-Bankruptcy Condition.

Desktop's public and internal predictions about whether and when it would run out of cash do not aid Nano either. As to Desktop's cash position, Nano asserts that Desktop's February financials reflect that Desktop's "unrestricted cash has been completely depleted" and that the company only has "approximately $10 million total cash remaining (including restricted cash)."[412] Nano also notes that Desktop's "overdue vendor bills with respect to its U.S. operations alone, far exceed[] the total

---

[410] JX-1267.

[411] JX-4086.

[412] Nano Post-Trial Opening Br. at 55.

cash that Desktop has in the U.S. to satisfy those bills."[413]  This does not include, Nano argues, the amounts that Desktop will owe in transaction expenses under the Merger Agreement.[414]  But these facts also do not constitute a written admission of Desktop's inability to pay its debts.  Rather, they are indications, based on a constellation of circumstantial evidence, that Desktop is enduring a liquidity crunch.

Also, Nano fails to explain why Desktop's current assets other than cash, such as inventory, should be excluded from the calculus.  Nano's expert calculated that, as of Q4 2024, Desktop's current assets excluding cash exceeded its current liabilities by $41.4 million.[415]  Kopa opined that, "[b]ecause the majority of the accounts receivable are in this past due category, [Desktop's] ability to further harvest working capital from accounts receivable collections will be limited in the near term."[416]  But receivables comprised $18.2 million of Desktop's $98.4 million in non-cash assets, while inventories and "Prepaid & Other Current Assets" accounted for $73 million and $7.2 million, respectively.[417]  Nano does not explain why these other assets should be ignored when assessing Desktop's ability to pay its debts.

---

[413] *Id.* at 55; *see also* JX-4217 ¶ 10 ("Based on the most recent Validated AP Overdue balance in the files referenced above, Desktop Metal has substantially more past-due AP to Third Party Vendors than it has cash available in the U.S. to pay such overdue payables.").

[414] Nano Post-Trial Opening Br. at 55–56.

[415] JX-1943 ¶ 63, Figure 10.

[416] *Id.* ¶ 83.

[417] *Id.* ¶ 63, Figure 10.

Additionally, Nano does not explain why Desktop's cash in foreign jurisdictions is not relevant in determining the company's ability to satisfy its debts as they mature. As Kopa notes in his own report, Desktop "holds and requires cash in various jurisdictions around the globe, including a substantial cash balance in Germany."[418] Nano's refusal to consider this cash is consistent with Kopa's statement that "Desktop Metal has acknowledged that impediments to moving cash between jurisdictions mean that will begin having liquidity issues prior to hitting a zero cash balance."[419] The possibility that Desktop could face issues in moving cash around to address its payables is not an admission that Desktop was unable to pay debts as they matured.

Aside from Kopa's report, Nano relies on Desktop's confidential communications submitted to CFIUS regarding its "restricted cash position, its operating cash number, it cash forecast through February 2025, and its impending bankruptcy in four of its operating jurisdictions" on October 10, 2024, and November 24.[420] Once again, these communications—in which Desktop pleads with CFIUS to move quickly in light of its precarious cash situation—are not the sort of written admissions that violate the No-Bankruptcy Condition.

In the October submission, Desktop lays out its cash position, including that the company's "total available closing balance is expected to fall below $10M by November 2024" at which point, "cash management will become increasingly

---

[418] *Id.* ¶ 79.

[419] *Id.*

[420] JX-1051 at 9; JX-1782 at 4.

difficult" resulting in the possibility that Desktop will have "inadequate operating funds to manage the business day-to-day even before its cash balance reaches zero."[421]

In the November submission, Desktop emphasizes the severity of its circumstances, noting that the company "anticipate[d] entering December with approximately $9 million in available cash on a consolidated basis" and warning that in each of its primary countries of operation (the United States, Germany, Japan, and Italy), Desktop "face[d] the risk of triggering a bankruptcy requirement without continued conversion of accounts receivable and inventory, with risks escalating weekly."[422]

Both submissions impress on CFIUS that bankruptcy was an imminent possibility for Desktop. Both seem designed to spur CFIUS to speed up its review. But both are carefully crafted so as not to constitute a representation that Desktop could not pay its debts when they matured.

Nano further argues that the fact that Desktop retained bankruptcy counsel shows that it could not pay its debts as they matured.[423] But as Desktop's COO credibly testified at trial, the company has not "retained" bankruptcy counsel, rather, its financing team has discussed bankruptcy with its transactional counsel, Latham

---

[421] JX-1051 at 9.

[422] JX-1782 at 4.

[423] Dkt. 250 ("Nano Pre-Trial Br.") at 25–26; Nano Post-Trial Opening Br. at 34.

& Watkins.[424]  That is consistent with deposition testimony Desktop employees gave on the same point.[425]  This does not constitute the relevant admission.

Implicitly conceding that its evidence concerning the No-Bankruptcy Condition is circumstantial at best, Nano asks the court to draw inferences in its favor, arguing that Desktop impermissibly blocked access to the relevant information in the following ways:

- Nano notes that Desktop confidentially submitted to CFIUS material statements about its financial state, purposefully withholding that information from Nano.  That information includes Desktop's restricted cash position, its operating cash number, and its cash forecast through February 2025.  But Nano ultimately received those documents in discovery.[426]  And Nano does not argue that they show Desktop was unable to pay debts as they matured.

- Nano claims that Desktop breached its Buyer Information Rights under the Merger Agreement.  But Desktop provided everything Nano requested.[427]

- Nano argues that Desktop impermissibly blocked discovery into its financial condition and evaded questions at trial.  And it is true that Nano's 30(b)(6) witness, Cole, found it difficult to provide hard-number answers to Nano's questions based on incomplete mid-quarter results. And Desktop's witness provided the information available to the

---

[424] Trial Tr. at 67:10–18 (Nogueira).

[425] Cole Dep. Tr. at 174:3–6 ("Q. And has Desktop retained restructuring counsel? . . . THE WITNESS: No."), 182:10–183:4 (describing conversations Desktop had with transactional counsel regarding solvency); Jordan Dep. 99:5–100:6 (explaining that the Desktop had conversations with its "general counsel, and . . . outside counsel" regarding solvency).

[426] Nano Post-Trial Opening Br. at 67.

[427] JX-1843.

company and good-faith estimates when possible.[428] But Desktop's financial witnesses gave clear testimony on this topic.[429]

In sum, Desktop's actions do not support the adverse inferences Nano requests.

Nano also argues that the court should "consider motive when evaluating the credibility of Desktop's witnesses" because Desktop's representations regarding its financial situation rely "almost exclusively on the testimony of executives who stand to make millions upon closing."[430] But this argument confuses who holds the burden on this point—it is Nano's job to prove that Desktop has violated the No-Bankruptcy Condition, not Desktop's job to prove that the company is solvent. Nano has not established Desktop wrongfully withheld probative financial information, and therefore, Nano's failure to show that Desktop made a written admissions of its inability to pay mature debts, definitively resolves this point in Desktop's favor.

Although Nano failed to meet its burden, the evidence is quite close. It is undeniable that Desktop is extremely cash strapped. As Desktop told CFIUS, operating the company became "increasingly challenging" as its cash balance fell below $10 million, which it did by December 2024.[431] Desktop was well aware of the risks of "triggering a bankruptcy requirement,"[432] and acknowledged that those "risks" were "escalating weekly."[433] It was a dire situation, as Desktop projected.

---

[428] Cole Dep. Tr. at 157:24-162:4.

[429] Trial Tr. at 393:10–21 (Cole); *id.* at 636:8–14 (Austin).

[430] Dkt. 275 ("Nano Post-Trial Answering Br.") at 15.

[431] JX-1782 at 4.

[432] *Id.*

[433] *Id.*

This is why Desktop emphasized speed when negotiating the Merger Agreement and in communications with CFIUS, secured a commitment from Nano to use its reasonable best efforts to close "as soon as reasonably possible,"[434] negotiated for a January 31, 2025 End Date to be extended only absent regulatory approval, and further negotiated for heightened efforts requirements as to CFIUS approval. As discussed above, the Murchinson board caused Nano to breach these obligations.

"[W]here a party's breach by nonperformance contributes materially to the non-occurrence of a condition of one of his duties, the non-occurrence is excused."[435] To invoke the doctrine, the non-breaching party must prove by a preponderance of the evidence that the breach "contributed materially to the failure of the condition by making its satisfaction less likely."[436] But "if it can be shown that the condition would not have occurred regardless of the lack of cooperation, the failure of performance did not contribute materially to its non-occurrence and the rule does not apply. The burden of showing this is properly thrown on the party in breach."[437] The doctrine does not require a finding of bad faith, but only some form of deliberate action.[438]

---

[434] Merger Agr. § 6.7(a).

[435] *Snow Phipps Gp, LLC v. KCAKE Acq., Inc.*, 2021 WL 1714202, at *52 (Del. Ch. Apr. 30. 2021).

[436] *In re Anthem-Cigna*, 2020 WL 5106556, at *91.

[437] Restatement (Second) of Contracts § 245 cmt. b (Am. Law Inst. 1981).

[438] *Snow Phipps*, 2021 WL 1714202, at *54.

Nevertheless, "[d]eliberate acts to sink a ship, while not necessary, can be sufficient to warrant application of the prevention doctrine."[439]

Even if Nano proved the No-Bankruptcy Condition as of February, Nano did not prove that condition as of December. If Desktop did experience a Bankruptcy after December, Nano materially contributed to that circumstance by intentionally slow rolling the CFIUS approval process to delay closing.

In all, Nano claims that Desktop failed the No-Bankruptcy Condition. This is Nano's strongest claim. And the evidence is quite close—almost equipoise. But Nano bears the burden of proof, which it has not met. Moreover, even if the evidence tilted in Nano's favor, Desktop has demonstrated that Nano prevented Desktop from meeting the No-Bankruptcy Condition by delaying CFIUS approval in breach of the Merger Agreement. The No-Bankruptcy Condition offers Nano no offramp from the road to closing.

### 2. The Covenant-Compliance Condition

#### a. Ordinary-Course Covenant

The Ordinary-Course Covenant obligates Desktop to "use commercially reasonable efforts to (x) conduct its business in the ordinary course consistent with past practice in all material respects; and (y) preserve intact its business organization and advantageous business relationships and keep available the services of its

---

[439] *Chordia v. Lee*, 2024 WL 49850 at *37 (Del. Ch. Jan. 4, 2024), *aff'd sub nom Lee v. Chordia,* ---A.3d--- 2025 WL 754003 (Del. Mar. 10, 2025).

current officers and key employees and maintain its relationships with key customers" and suppliers.[440]

To assess whether a party has complied with an ordinary-course obligation, the court will "compare the company's actions with how the company has routinely operated and hold[s] that a company breaches an ordinary course covenant by departing significantly from that routine."[441] Even where a company takes actions that could be "characterized as an ordinary course response to" an extraordinary event, "what matter[s] for the covenant [is] the departure from how the company . . . operated routinely in the past."[442]

Under common law, ordinary course covenants are subject to a materiality standard. They have been interpreted as intending to "reassure a buyer that the target company has not materially changed its business or business practices during the pendency of the transaction."[443] In this case, the Merger Agreement applies an express materiality overlay. Under the Covenant-Compliance Condition, Nano must show that Desktop failed to comply "in all material respects."[444]

Nano argues that Desktop violated the Ordinary-Course Covenant in three ways, by: failing to keep available the services of its current officers and key

---

[440] Merger Agr. § 5.1(a).

[441] *AB Stable*, 2020 WL 7024929, at *70.

[442] *Id.* at *69.

[443] *Anschutz Corp. v. Brown Robin Capital, LLC*, 2020 WL 3096744, at *11 (Del. Ch. June 11, 2020).

[444] Merger Agr. § 7.2(b).

90

employees; failing to maintain its relationships with key customers and suppliers; and failing to conduct a 2024 audit.

### i. Current Officers And Key Employees

Nano's first argument rests on its assertion that Desktop was "hemorrhag[ing] dozens of engineers and several key executives, totaling 10% of its workforce."[445] But Nano must show more than head-count decline under the Ordinary-Course Covenant, which requires that Nano demonstrate that Desktop's efforts were not "commercially reasonable," and that Desktop lost the "services of" "current officers" or "key employees."

Nano cannot prove that Desktop's efforts were commercially unreasonable given that Nano was involved in those efforts. According to Nano's CFO, Nano "worked together on plans to retain Desktop's employees after the merger agreement was signed" and "Desktop did what Nano and Desktop had agreed to do with respect to [employee] retention."[446] Nano does show that any of the 10% of the workforce that Desktop allegedly lost were "current officers" or "key employees."[447] Nor does Nano claim that "the *services of* its current officers and key employees" were lost, as would also be required to show breach.[448]

---

[445] Nano Post-Trial Opening Br. at 61.

[446] Trial Tr. at 480:4–14 (Pinchas); *see also* Pinchas Dep. Tr. at 105:9–106:12.

[447] Merger Agr. § 5.1(a).

[448] *Id.* § 5.1(a) ("keep available the services of its current officers and key employees").

Nano also makes no effort to demonstrate materiality. On this score, Nano's 10% figure is misleading. The headcount decline in the second of half of 2024 was just 6% after accounting for post-signing hires (who provided the same "services").[449] Plus, headcount decline was not unordinary for Desktop. As Nano's CFO testified at trial, Desktop "was implementing workforce reductions prior to execution of the [M]erger [A]greement."[450] Indeed, Desktop announced in January 2024 that it was planning to reduce its workforce by 20% that year,[451] and the total headcount decline for 2024 was squarely in-line with that projection. Further, the 6% net number for the second half of 2024 was lower than the 8.9% reduction in the second half of 2023.[452]

Nano cites *AB Stable* to show that a workforce reduction can breach an ordinary-course covenant,[453] but the target there "radically" departed from the ordinary course of business in multiple ways. The target was a hotel chain facing an unprecedented decline in business due to the COVID-19 pandemic. It closed two of its fifteen hotels, kept the other thirteen open in name only with a skeletal staff,

---

[449] Trial Tr. at 81:16–82:6 (Nogueira).

[450] *Id.* at 474:13–16 (Pinchas); *see also* Stern Dep. Tr. at 61:22–62:8; Nedivi Dep. Tr. at 103:5–19.

[451] JX-614 at 14. *Compare* JX-1755 at Tab Headcount_12.28.23 (total headcount at the end of 2023 being 1054), *with* JX-1943 at 21 (Fig. 4) (total headcount at 2024 Q4 being 834).

[452] JX-614 at 64.

[453] Nano Post-Trial Opening Br. at 61 (quoting *AB Stable*, 2020 WL 7024929, at *76 (finding that "slash[ing] employee headcount" constituted an ordinary course covenant breach)).

dramatically reduced marketing and capital expenditures, and also furloughed over 5,000 employees.[454] These facts are far more dramatic than Desktop's 6% reduction in force.

Nano has failed to prove that Desktop's decline in workforce violated the Ordinary-Course Covenant.

### ii. Maintaining Business Relationships

Nano next argues that Desktop breached the Ordinary-Course Covenant by suspending payments to vendors and undertaking aggressive collections efforts with customers, resulting in deteriorated relationships with each. In support, Nano cites the vendor communications discussed in connection with the No-Bankruptcy Condition,[455] as well as an internal email regarding Desktop's "weekly AR Collections report."[456]

The vendor communications do not support Nano's Ordinary-Course Covenant argument.[457] Those communications collectively show that Desktop was struggling with vendor relationships and disputing bills and payment terms. But Nano did not take discovery from any customers or suppliers to test whether those relationships had discontinued or even changed.[458] Some of the exchanges resulted in revised, more

---

[454] *AB Stable,* 2020 WL 7024929, at \*75–78.

[455] Nano Pre-Trial Br. at 19; Nano Post-Trial Opening Br. at 58, 61–62.

[456] Nano Pre-Trial Br. at 19 (citing JX-1206).

[457] *See supra* Part II.B.1.

[458] Trial Tr. at 99:7–10 (Nogueira) (describing Desktop's "vendor relations" as "ebb[ing] and flow[ing] . . . over the years").

93

flexible payment terms.[459]  At most, the vendor emails suggest that some vendor relationships had become strained.  They do not do the work of establishing that these vendor relationships were "key"[460] or that they were so strained as to no longer be "intact."[461]

Nano cites *Cooper Tire & Rubber Company v. Apollo* for the proposition that altered payment practices that disrupt vendor relationships can violate an ordinary-course covenant.[462]  But in *Cooper Tire*, the seller halted payments to vendors shipping supplies to one of its key subsidiaries with the express intent to hold up production at the subsidiary and compel an end to an ongoing labor strike there.[463] In contrast, Nano points to no evidence suggesting Desktop intentionally withheld payment from vendors to cause disruption to Desktop's production as a means of exerting pressure (or for any other purpose).  *Cooper Tire* is inapposite.

Nano's argument that Desktop has failed to maintain its customer relationships stands on even shakier ground.  The sole support that Nano cites for this premise is an email from Desktop's accounts receivable department relaying that

---

[459] *See supra* Part II.B.1.

[460] One of the vendor emails is for less than $2,000 from "BostonBean," which provides coffee, breakroom, and pantry services to Boston offices.  Nano does not argue that BostonBean was a "key" supplier with which Desktop had an "advantageous business relationship[]."  Nano Post-Trial Opening Br. at 44–45 (citing JX-4124).

[461] Trial Tr. at 108:17–6 (Nogueira) (credibly testifying that despite conversations regarding past-due invoices, Desktop still had "good relationship[s]" with two of its key vendors, Jabil and Align).

[462] Nano Post-Trial Opening Br. at 61.

[463] *Cooper Tire & Rubber Co. v. Apollo (Mauritius) Hldgs. Pvt. Ltd.*, 2014 WL 5654305, at *17 (Del. Ch. Oct. 31, 2014).

the company had spent a "significant amount of time . . . pursuing balances 2,500-60K."[464] Nano characterizes such collection efforts as "aggressive" and argues that it did not consent to them.[465] Nano's characterization of this exchange does not make it so. Nano has not met its burden to establish that Desktop failed to maintain customer relationships.

Nano has failed to prove that Desktop failed to preserve intact its advantageous business relationships and maintain its relationships with key customers.

### iii. 2024 Audit

Nano argues that Desktop has not conducted a 2024 audit and does not plan to file a Form 10-K within the statutory deadline, in violation of its obligation to maintain financial accounting practices.[466]

Prior to the Murchinson takeover, the parties reasonably expected the transaction to close before the end of 2024.[467] Further, both parties expected that Nano would prepare the combined company audit in consultation with its auditor, KPMG.[468] Because the transaction would result in Desktop no longer being a public

---

[464] Nano Pre-Trial Br. at 19 (citing JX-1206).

[465] *Id.*

[466] Nano Post-Trial Opening Br. at 53–54, 61–62.

[467] *See* JX-3215 at 10; JX-3213 at 6.

[468] JX-1202 at 48 (11/19/24 Nano presentation regarding post-Merger integration stating, "Audit—KMPG to audit combined company"); JX-3210 (12/4/24 email from Nano introducing its "audit partner from KPMG" to Desktop personnel); JX-3214 at 2 (Email exchange between KPMG and Desktop regarding ongoing inventory counts).

company, there was no need at that time for Desktop to retain a separate auditor for its 2024 10-K, due to be filed until March of 2025.[469] Nano's pre-merger integration documents said as much, setting out that Desktop would begin unified financial reporting with Nano well in advance of the 10-K filing date.[470]

Nano's conduct is to the same effect. On December 4, 2024, Nano connected Desktop with its auditor, KPMG, to conduct inventory counts for purposes of a combined audit.[471] These communications make no mention of involving Desktop's auditor, Deloitte, in the inventory counts. The parties understood that, in Nano's words, "KPMG [will] audit [the] combined company."[472] Around this time, Nano also contacted a vendor that Desktop uses for SEC filings and encouraged Desktop to cancel the service before it automatically renewed on January 8, 2025. Nano reasoned that the service would not be needed once the two companies combined.[473] Desktop stated that it was "not until December 17, 202[4]—after Murchinson's takeover of Nano—that KPMG informed Desktop that it would no longer proceed with the combined company audit[.]"[474] But even that communication from KPMG does not clearly relay that KPMG will not be performing the combined audit; it only states that KPMG is going to "hold off on attending inventory counts until the close date of

---

[469] Dkt. 101 (Am. Compl.) ¶ 79; Dkt. 106 (Am. Counterclaims) ¶ 4.

[470] JX-1202 at 48–49.

[471] JX-3210.

[472] JX-1202 at 48.

[473] JX-3214 at 77–82.

[474] Nano Pre-Trial Brief at 60.

the transaction is certain" in order to "avoid doing unnecessary work [because] if the transaction close date is not close to the count date, [KPMG] would need to perform more extensive roll forward procedures."[475] This email suggests that the combined company audit was delayed, not foreclosed.

In these circumstances, Nano cannot show that it would have been reasonable for Desktop to engage Deloitte to conduct an audit—an audit that Nano did not want and that would be immediately called off post-closing.

Nano's cites to *Akorn, Inc. v. Fresenius Kabi AG*, but that case is inapposite.[476] There, the court found that a generic pharmaceuticals company departed from its ordinary course when it elected to pare down its FDA audit procedures ahead of closing.[477] The audits at issue in *Akorn* were essential to the seller's core function as a drug manufacturer—any departure from ordinary audit practices would necessarily be material. Here, Desktop's failure to file a Form 10-K in time will have no similarly material effect on its ability to conduct business post-closing.

Desktop's failure to conduct a 2024 audit, and the fact that it does not plan to file a Form 10-K within the statutory deadline, does not violate the Ordinary-Course Covenant.

---

[475] JX-1490 at 1.

[476] Nano Post-Trial Answering Br. at 5, 41.

[477] *Akorn*, 2018 WL 4719347, at *19–20.

### b. Receivables/Payables Covenant

The Receivables/Payables Covenant prohibits Desktop from "chang[ing] or modify[ing] in any manner the existing credit, collection and payment policies, procedures and practices in respects to accounts receivable and accounts payable."[478] In support of its argument that Desktop breached this covenant, Nano points to Desktop's aggregate financial data, which it argues reflects that Desktop materially slowed its payables between July 2024 and February 2025 and drastically increased its collection efforts over the same period.[479] Nano also relies on Desktop's internal guidance, including board decks and emails from management and directors, which Nano characterizes as "demonstrat[ing] a concerted action to speed up collections and slow down payables."[480] Nano has failed to prove that either Desktop's financials or its internal communications regarding the company's accounts receivable and accounts payable reflect a breach of the Receivables/Payables Covenant.

### i. Accounts Receivable

Nano argues that the following changes in Desktop's financials reflect that the company accelerated accounts receivables post-signing: (i) accounts receivables decreased by a significant amount from Q2 2024 to Q4 2024, particularly as compared to the decrease in Desktop's total revenue over the same period; and (ii) Desktop's "days sales outstanding" ("DSO") declined from Q2 2024 to Q4 2024, from

---

[478] Merger Agr. § 5.1(b)(vi).

[479] *Id.*

[480] *Id.* at 65.

approximately 68 days to 50 days.[481]  Nano's analysis however, focuses only on three quarters in 2024.[482]  As a result, it does not capture whether the highlighted changes are from modified practices or procedures or market forces, like seasonal differences.[483]  Kopa's narrow data set is problematic in this situation, where the court must determine if Desktop's post-signing business practices comport with their ordinary-course activities.

On this point, Desktop's financial expert, Yvette R. Austin, is more persuasive. Austin is the Senior Managing Director and Chair of Compass Lexecon's Global Finance Practice and has 30 years of experience in a wide range of economic areas including valuation, credit and solvency analysis, and other financial damages.[484] Austin takes a longer view of Desktop's receivables and payables practices.  In addition to reviewing trends over the course of Q2 to Q3 of 2024,[485] Austin also compared Desktop's working capital levels for the entirety of 2024 against previous

---

[481] Nano Post-Trial Opening Br. at 63–64; Nano Post-Trial Answering Br. at 9–11; JX-1943 ¶ 64(1).

[482] Desktop also raises that Kopa's reliance on Desktop's Oracle ERP system to conduct his payables analysis is flawed because those figures have not been adequately validated.  Dkt. 268 (Desktop Post-Trial Opening Br.) at 80–81.  Nano responds that it cannot be blamed for using unreliable data, because that is all Desktop provided.  Nano Post-Trial Answering Br. at 12.  In all events, the court finds Desktop's financial expert more reliable on this issue because of her expanded scope of review, and thus, does not reference Kopa's use of Oracle ERP data to challenge his findings.

[483] JX-1969 (Austin Rep't) ¶ 76.

[484] *Id.* ¶ 1.

[485] Austin excludes Q4 2024 from her analysis on the basis that the market was aware of the heightened risk that the transaction would not close in 2024.  JX-1969 ¶ 72.

years.[486] Austin's analysis demonstrates that Desktop's average DSO from Q1 2021 to Q1 2024 was 70 days, whereas average DSO for Q2 2024 and Q3 2024 was nearly identical at 71 days.[487] For the years 2021 to 2023, Desktop's historical DSO averaged 69 days, compared to the average during the four quarters of 2024 of 70 days.[488] Both comparisons show that Desktop has not accelerated its receivables collections during the post-signing period.

Nano also argues that Desktop's internal guidance to employees was to ramp up its collection processes, but Desktop CFO Cole credibly testified that the push to accelerate collections was not a modification to its pre-signing procedures or practices. Since 2023, Desktop has steadily intensified its efforts to collect on its receivables.[489] Beginning in early 2024, Desktop augmented this effort by having business leaders leverage their relationships with customers to collect aged balances.[490]

It is worth noting that although the court does not adopt them, Kopa's own findings comport with Cole's testimony.[491] Kopa notes that Desktop's accounts

---

[486] *Id.*

[487] JX-1969 ¶ 74.

[488] *Id.*

[489] Trial Tr. at 367:19–368:19 (Cole).

[490] *Id.* at 424:17–425:7 (Cole). It bears noting that these efforts focused on aged balances, as do many of the emails Nano cites in briefing. *See* Nano Post-Trial Opening Br. at 27 (citing JX-1710 at 5 (discussing 40% reduction in aged receivables over 60 days due); JX-1206 (discussing efforts to collect "aged" receivables)). Collection of aged receivables is definitionally not an acceleration.

[491] Trial Tr. at 367:19–368:19 (Cole).

receivable declined by nearly 17% between Q1 and Q2 2024.[492]  The Q2 2024 actual accounts receivable figures (from the period *before* signing) were 30% *below* projections.[493]  And the Q4 2024 revenues—which affect accounts receivables—were approximately 35% below projections.[494]  In sum, the delta between the actual results and projections evidence that—consistent with the period immediately preceding signing—Desktop converted working capital to cash at a higher rate than it conservatively assumed, and revenues were lower than projected.

Nano failed to prove that Desktop materially changed or modified any aspect of its accounts receivable policy.

### ii.    Accounts Payable

Nano's arguments regarding Desktop's financial results and internal direction on how to treat payables also fail to establish that Desktop violated the Receivables/Payables Covenant.

As to the financial data, Nano notes that "between July 2024 and February 2025, Desktop's accounts payable due to third-party vendors increased by 50% and the amounts overdue increased by 63%[.]"[495]  In addition to the amount of the payables increasing, Nano notes that the days outstanding for payment as to

---

[492] Trial Tr. at 565:14–20 (Kopa); *compare* JX-471 at 3, *with* JX-669 at 3.

[493] JX-679 (Sheet BS-CF) (showing projected Q2 AR balance of $41.9 million); JX-667 at 3 (showing Q2 AR balance of 29.5m).

[494] JX-679 (Sheet Simple PL) (showing projected Q4 revenues of $50.8 million); JX1831 (Sheet FS_IncomeStatement QTD) (showing actual Q4 revenues of $32.8 million).

[495] *Id*. at 64 (citing JX-4217 at Exhibit 2).

Desktop's accounts payable "more than doubled" between Q2 and Q4 of 2024.[496]  But for the reasons stated above, this analysis suffers from being too narrow in scope, and thus the court adopts Austin's analyses with respect to comparing Desktop's pre- and post-signing receivables practices.  Austin's report shows that Desktop averaged 50 days to pay its outstanding payables in Q4 2024, which is exactly the same as Desktop's historical average in the period from Q1 2021 to Q1 2024, before the Merger Agreement.[497]

Kopa's payables analysis is further undermined by his comparison between Desktop's non-GAAP cost of goods sold ("COGs") and the amounts of the accounts payable over the period from Q2 to Q4 2024, which he opines indicates that Desktop materially slowed payables.[498]  But as Desktop pointed out at trial, the Non-GAAP COGs would not include the company's transaction and litigation expenses, while the payables figure would, making a comparison between the rates of the decline unreliable.[499]

Last, Nano points to internal guidance Desktop gave its employees via board decks and emails from management as evidence of Desktop's shift in payables strategy.[500]  But these materials are not persuasive on the issue.  Nano notes that a

---

[496] *Id.* (citing JX-1969 ¶ 75, Exhibit 4).

[497] JX-1969 ¶ 75.

[498] JX-1943 ¶ 64(3); Trial Tr. 550:19–55:23 (Kopa).

[499] Trial Tr. at 571:16–573:4 (Kopa) (agreeing that if one excludes Desktop's transaction and litigation expenses from its payables figure, the rate of decline between its non-GAAP COGs and payables gets "closer to being . . . correlated").

[500] Nano Post-Trial Opening Br. at 65.

Desktop board deck from September included a "Cash Management" page, which laid out Desktop's "[h]ighest priorities," including "[e]xpense control."[501] But with respect to accounts payable, the same slide notes that the company's days payable outstanding has "remained around 60 days."[502] Rather than reflecting a change in policy, the slide reflects that Desktop's payables practices remained consistent.

Nano also points to emails from Desktop's CFO and one of Desktop's directors urging the company to prioritize cash management.[503] But the email from the CFO begins with, "I'm certain it doesn't come as a surprise that managing cash is a cornerstone priority for DM."[504] Again this language evidences a continuation of cash management practices or at most, a re-emphasis on them, not the installation of completely new procedures. And the email from Desktop director Stephen Nigro, though emphatic about Desktop's need to "improve its cash management," offers only suggestions that he hopes Desktop will "seriously consider[]."[505] And notably, none of the suggestions concern Desktop's accounts payable policies and procedures.

Nano failed to prove that Desktop materially changed of modified any aspect of its accounts payable policy.

---

[501] *Id*. at 22 (citing JX-925).

[502] JX-925 at 11.

[503] Nano Post-Trial Opening Br. at 65 (citing JX-748, JX-809).

[504] JX-748.

[505] JX-809.

###### c. Transaction-Expenses Covenant

Section 5.1(b)(xx) prohibits Desktop from "incur[ring] Company Transaction Expenses that, in the aggregate, exceed $15,000,000."[506] "Company Transaction Expenses" is defined to include "fees and expenses of legal counsel [and] advisors . . . incurred by . . . the Company . . . in connection with this [Merger] Agreement or the consummation of the transactions contemplated by this [Merger] Agreement[.]"[507]

Desktop has incurred only $13.47 million in Company Transaction Expenses, under the $15 million cap.[508] Still, Nano argues that Desktop should include "the legal fees and expenses spent on this litigation," in which case Desktop would have exceeded the $15 million cap.[509] Nano argues that the plain meaning of "expenses of legal counsel incurred by . . . the Company . . . in connection with this Merger Agreement" includes fees spent in enforcing the Merger Agreement.

Desktop responds that "Company Transaction Expenses" are just transaction expenses, and limited to expenses "incurred or payable by the Company or any Company Subsidiary . . . in connection with this Agreement or the consummation of the transactions contemplated by this Agreement."[510] Desktop further argues that the definition of Company Transaction Expenses explicitly addresses various

---

[506] Merger Agr. § 5.1(b)(xx).

[507] *Id.* § 9.2.

[508] Nano Post-Trial Opening Br. at 66.

[509] *Id.*

[510] Merger Agr. at 56.

transaction-related fees and expenses, but nowhere contemplates post-signing litigation expenses to enforce the agreement itself.[511]

"If a contract [is] susceptible of two constructions, one of which would produce an absurd result and the other of which would carry out the purpose of the agreement, the latter construction should be adopted."[512]

Desktop's argument is consistent with the parties' contractual scheme. The parties stipulate to specific performance in the event of breach.[513] Nano's reading of Company Transaction Expenses would effectively preclude Desktop from seeking specific enforcement of the agreement by limiting its litigation budget. Nano has spent more than $17 million on this litigation.[514] Nano's reading effectively means that only Nano has a right to zealously enforce the Merger Agreement due to the asserted cap on litigation fees.[515] This is the sort of non-sensical result that would defy any party's reasonable expectations.

If Nano correctly interpreted the definition of Company Transaction Expenses, the prevention doctrine precludes Nano from terminating the Merger Agreement based on a failure of the Transaction-Expenses Covenant.[516] That is because Desktop

---

[511] *See id.*

[512] *Osborn v. Kemp*, 991 A.2d 1153, 1160 n.21 (Del. 2010).

[513] Merger Agr. § 9.11.

[514] JX-3388; JX-3389.

[515] *See Manti Hldgs. v. Authentix Acquisition*, 261 A.3d 1199, 1208 (Del. 2021) ("Contracts will be interpreted to 'give each provision and term effect' and not render any terms 'meaningless or illusory.'").

[516] *See supra* Part II.B.1.

never would have incurred "legal fees and expenses spent on this litigation" but for Nano's breaches of the Merger Agreement. Allowing Nano to benefit from its own breach by counting enforcement costs against the transaction expense cap would improperly reward contractual violations.

Nano failed to prove that Desktop materially breached the Transaction-Expenses Covenant.

### 3.    Bridge-Loan Requirement

The Bridge-Loan Requirement obligates Desktop to "cooperate in good faith with [Nano] to negotiate, agree upon and execute" the Bridge Loan facility, "on the terms and subject to the conditions" set out on the Bridge Loan term sheet.[517] The Bridge Loan term sheet incorporated the representations, warranties, and covenants of the Merger Agreement and provided that any further covenants be "customary for a facility of this type."[518]

To show breach, Nano relies on the fact that Desktop ceased negotiations over the Bridge Loan documentation around September 27. The relevant background is brief: Nano's September 12 draft required Desktop to make certain representations at the time of signing documentation. For example, Nano's draft included a requirement that Desktop represent that it is solvent at the time of signing. Desktop proposed that the covenant be "springing"—made when Desktop drew down on the

---

[517] Merger Agr. § 6.15; JX-714 (term sheet).

[518] JX-714 at 2.

loan facility.[519] Nano rejected the proposal, stating that Nano "commit[ted] to lend, the loan agreement, including the covenants, should be binding."[520] Desktop responded that "[t]he business ask isn't going to change."[521] Desktop did not send further comments.

It is hard to make sense of Nano's claim, given that the Bridge Loan was intended to supply Desktop with working capital and thus intended to benefit Desktop.[522] There was no reason for Desktop to object to signing a Bridge Loan if the terms were consistent with what it agreed to. And there is no harm to Nano resulting from Desktop's failure to negotiate the Bridge Loan documentation. Nano argues that Desktop failed to negotiate toward documentation because it did not want a reduction in the merger consideration, but this does not make sense either. It is true that Desktop had no intention of drawing on the loan facility. As Fulop testified, Desktop made that decision before signing the Merger Agreement.[523] But Desktop agreed to a reduction in merger consideration for draws on the loan facility, not for executing loan documentation.[524]

---

[519] JX-967.

[520] JX-985.

[521] *Id.*

[522] JX-714 at 1.

[523] Fulop Dep. Tr. at 68:19–69:3, 70:4–9, 304:11–15, 310:11–17, 312:3–13, 322:20–323:1.

[524] Merger Agr. at 56 (reducing "Per Share Merger Consideration" by the "Bridge Loan Facility Consideration Adjustment Amount"), *id.* at 53 (defining "Bridge Loan Facility Consideration Adjustment Amount" as the quotient of the "Closing Loan Balance" divided by $2.5 million and $0.10, capped at $0.80), and *id.* at 54 (defining

In any event, the Merger Agreement required that the representations and covenants in the Bridge Loan be those of the Merger Agreement or "customary of a facility of this type." Nano's demands were neither. The Merger Agreement, for example, did not contain a solvency representation like what Nano attempted to insert in the Bridge Loan.[525] Nor was that term "customary for facilities of this type," according to Desktop's expert Jonathan F. Foster.[526] Foster's overall impression was that the Bridge Loan as proposed by Nano contained requests consistent with those a lender might make in the context of due diligence—that is, before making a determination as to whether to extend credit. Foster opined it unusual that a lender would demand such terms where (as here) the lender has already agreed to extend credit and seeks additional information to help the lender monitor the loan.[527]

It was not bad faith for Desktop to refuse to agree to terms inconsistent with the term sheet and not customary. Nano failed to prove that Desktop breached the Bridge-Loan Requirement.

---

"Closing Loan Balance" as "the aggregate principal amount outstanding under the Bridge Loan Facility").

[525] JX-604 at 7 (6/11/24 email from Nano's counsel attaching an issues list reflecting that Nano agreed to remove the solvency representation "subject to agreement on operation of business covenant and loan term sheet"); *see also* JX-946 at 79 (9/24/24 email forwarding the latest draft of the Credit Agreement from Nano's counsel, which contains a solvency representation); *compare* JX-553 at 36 (5/28/24 email from Nano's counsel sending a draft merger agreement that included a solvency representation), *with* JX-616 (6/12/24 email from Nano's counsel sending a draft merger agreement that does not include a solvency representation).

[526] JX-414 (Foster Rep't) at ¶¶ 25–27.

[527] JX-414 ¶¶ 29–41.

## C. The Remedy

Desktop has proven that Nano breached its obligation to "take[], all action necessary to receive CFIUS Approval so as to enable the Closing" and use "reasonable best efforts" to consummate the merger. As a remedy, Desktop seeks specific performance of this provision and the Merger Agreement as a whole. Specifically, Desktop asks the court to force Nano to consent to the March 5 NSA provided by CFIUS and take all other actions necessary to obtain CFIUS approval for this deal.[528] Nano has proven no reason to reject the March 5 NSA. The NSA is the last hurdle to CFIUS approval, and CFIUS approval is the last condition to closing, meaning that Nano will be obligated to close once CFIUS approves the transaction.

Desktop is entitled to the relief it seeks. The parties to the Merger Agreement stipulated to specific performance in the event of breach. Section 9.11 provides:

> The parties acknowledge and agree that irreparable damage would occur in the event that any provision of this Agreement were not performed in accordance with its specific terms or were otherwise breached, and that monetary damages, even if available, would not be an adequate remedy therefor. It is accordingly agreed that, prior to the termination of this Agreement pursuant to Section 8.1, the parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the performance of terms and provisions of this Agreement as provided for herein, without proof of actual damages (and each party hereby waives any requirement for the securing or posting of any bond in connection with such remedy), this being in addition to any other remedy to which they are entitled at law or in equity. The parties further agree not to assert that a remedy of specific enforcement is unenforceable, invalid, contrary to Law or inequitable for any reason, nor

---

[528] PTO ¶ 69.

109

> to assert that a remedy of monetary damages would provide an adequate remedy for any such breach.

The parties' stipulation to specific performance in the event of breach is enough to deem such relief appropriate in this context.[529] If Nano wants to disclaim its acknowledgment in Section 9.11 based on a common law analysis, then Nano bears the burden of proving that the equities balance in its favor.[530]

Regardless of who bears the burden, the equities favor specific performance. Nano's failure to take actions necessary to close has created uncertainty for customers, suppliers, and employees, including the "700 families" who work for Desktop.[531] There are also "significant national security repercussions" if the deal does not go through.[532] There is no evidence of harm to Nano if this court enforces

---

[529] *Snow Phipps*, 2021 WL 1714202, at *51 ("This [C]ourt has not hesitated to order specific performance in cases of this nature … where sophisticated parties represented by sophisticated counsel stipulate that specific performance would be an appropriate remedy in the event of breach."); *Channel Medsystems, Inc. v. Bos. Sci. Corp.*, 2019 WL 6896462, at *40 (Del. Ch. Dec. 18, 2019) (enforcing contractual specific performance clause); *Level 4 Yoga, LLC v. CorePower Yoga, LLC*, 2022 WL 601862, at *30 (Del. Ch. Mar. 1, 2022), *judgment entered*, (Del. Ch. 2022), *aff'd*, 287 A.3d 226 (Del. 2022) (same); *see also* Kathaleen St. J. McCormick & Robert Erikson, *Delaware's Approach to Specific Performance in M&A Litigation*, 20 NYU J.L. & Bus. 7 (2023).

[530] Specific performance is appropriate when (1) a valid contract exists, (2) the plaintiff is ready, willing, and able to perform, and (3) the balance of equities tips in the plaintiff's favor. *Snow Phipps*, 2021 WL 1714202, at *51. No one disputes the first two elements. The Merger Agreement is a valid contract and Desktop is ready, willing, and able to perform.

[531] Trial Tr. at 504:17–508:19 (Fulop); Chiu-Rothell Dep. Tr. at 273:14–281:14; Jordan Dep. Tr. at 67:24–75:3.

[532] Trial Tr. at 504:17–508:19 (Fulop); *id.* at 54:3-8 (Nogueira).

the clear contractual language requiring Nano to take "all action necessary" to obtain CFIUS approval and use "reasonable best efforts" to consummate the merger.

This case is fundamentally different from *Alliance Data Systems v. Blackstone Capital Partners*, on which Nano relies.[533] There, the court found no breach of a party's "best efforts" obligation based on the failure to obtain a required regulatory approval. The plaintiff's merger partner was "willing to enter into assurances of the kind the [agency] was demanding." And closing was conditioned on the actions of a third party that was not a signatory to the merger agreement.[534] Here, Nano is the only hold-up to the NSA, and Nano's breaches are the only reason CFIUS approval has not yet been granted.

Desktop is entitled to specific performance.

## III.   CONCLUSION

Partial final judgment is entered in favor of Desktop as set out in the Order and Partial Final Judgment entered contemporaneously with this Post-Trial Memorandum Opinion.

---

[533] 963 A.2d 746, 764 (Del. Ch. 2009) (cited in Nano Post-Trial Opening Br. at 90).

[534] *Id.* at 764–65.